**Michael T. WILLIS, Francie Willis, Urban Retreat of Houston, Inc., and Willis Hite Enterprises, Inc., Petitioners,**

v.

**Dan DONNELLY, Respondent.**

No. 04–0409.

Supreme Court of Texas.

Argued Nov. 17, 2005.

Decided June 2, 2006.

Rehearing Denied Sept. 22, 2006.

Marie R. Yeates, Harry M. Reasoner, Paul E. Stallings, D. Gibson Walton, Penelope E. Nicholson, Thad T. Dameris, Vinson & Elkins L.L.P., Billy Shepherd, Stephen R. Bailey, Cruse Scott Henderson & Allen, L.L.P., Amir H. Alavi, R. Glen Rigby, Pillsbury Winthrop LLP, Houston, for Petitioners.

Jeffery T. Nobles, Diane M. Guariglia, Allyson L. Mihalick, John K. Broussard Jr., Henry S. Platts, Beirne Maynard & Parsons, L.L.P., William T. Powell, Michael H. Norman, Norman & Powell, Houston, for Respondent.

Justice WILLETT delivered the opinion of the Court.

This dispute centers on whether shareholders in closely held corporations can be held liable to an individual who agreed to a contractual business arrangement with the corporations. We agree with Petitioners Michael and Francie Willis (the Willises) that they cannot be held liable to Respondent Dan Donnelly under breach of contract and breach of fiduciary duty theories. We address other issues as well.

## I. Background

### A. Factual Background

Michael Willis (Willis) is a successful Houston entrepreneur. In the late 1980s, he became intrigued with the idea of opening a high-end spa, where customers could receive hair styling and other personal services such as manicures and massages. He hired Richard Hite as a consultant to help develop the idea. Willis also received assistance from Charles Gebhardt, an accountant. The business plan called for the spa to be named the Urban Retreat.

Willis and others created two corporations to carry out the plan. One of the corporations would operate the initial spa. If the business succeeded a second corporation would serve as an umbrella company. The plan was eventually to "roll up" the separate spas into a single company if the concept worked in multiple locations. In March 1989 Willis/Hite Enterprises, Inc. was incorporated, and the corporation was later renamed Urban Retreat of Houston, Inc. (URH). Willis and Gebhardt were the original shareholders of URH. In August 1989, a second company called Willis/Hite Enterprises, Inc. (WHE) was incorporated as the umbrella company. Willis, Gebhardt, and Bill Caudell were the original shareholders of WHE. URH and WHE were separate corporations, and one was not the subsidiary of the other. URH and WHE are Petitioners to this appeal along with the Willises. The articles of incorporation of URH and WHE name Willis, Hite, and Gebhardt as the original directors. Willis became the chairman of URH, and Hite was elected its president.

Hite contacted Dan Donnelly (Donnelly), a successful hair stylist. Donnelly was the co-owner of Hairmasters of Houston, Inc.

(Hairmasters), an incorporated business operating a hair salon. Hite and Willis met informally with Donnelly and discussed the idea for the spa. Donnelly had no prior business or personal dealings with Willis.

With drafting assistance from Gebhardt, Hite and Willis eventually signed a letter agreement that lies at the heart of this dispute. The agreement is typed but has numerous handwritten changes initialed by Hite and Donnelly. Gebhardt testified that Willis "didn't have anything to do with" the drafting of the agreement. There are several drafts of agreements concerning the Urban Retreat, and the record is uncertain as to when earlier drafts of the letter agreement were prepared and circulated. Donnelly showed a draft of the agreement to his lawyer and signed the final agreement on July 10, 1989, at a meeting attended by Donnelly, Hite, Willis, and Gebhardt. Donnelly signed as president of Hairmasters and individually. The only other person who signed the agreement was Hite, who signed as president of WHE and individually.

The agreement states in its opening sentence that it is "a letter agreement between [WHE], Richard H. Hite, Mike Willis, and [URH], and Daniel Donnelly and [Hairmasters]." A signature block at the end of the agreement was typed for "Mike Willis, Individually," but Willis crossed out this signature block at the July 10 meeting where the agreement was signed, and did not sign or initial the agreement. Donnelly testified that he signed the agreement after Willis's name was crossed out. Willis testified that he crossed his name out to make clear he did not agree to be bound in his individual capacity. Donnelly's expert witness testified that because Willis removed himself as an individual signatory to the agreement, "Mr. Willis did not intend to be a part of this agreement." Gebhardt testified that at the meeting where the agreement was signed, Willis made comments to the effect that he would not be individually responsible under the agreement, and Gebhardt passed these comments along to Hite and Donnelly.

The agreement obliged Donnelly to transfer the entire Hairmasters business to URH, but qualified this obligation with some "best efforts" language.[1] It provided that Donnelly "will have the responsibility to oversee the management of the day to day operations of the URH facility."

The agreement provided that WHE and URH agree to issue Donnelly twenty-five percent ownership in URH within twelve months of the URH "Grand Opening," or when URH's gross revenues reached Hairmasters' 1988 annual gross revenues, whichever occurred first. It provided for additional stock transfers as various revenue targets for URH are met. It separately stated that WHE would issue Donnelly ten percent ownership in WHE under the same terms as the initial transfer of URH stock. It provided that Donnelly would receive a salary of $110,000, and a salary equal to five percent of URH's gross revenues after two years.

As discussed further below, the parties disputed the applicability of two other provisions of the letter agreement, the "Termination" provision and the provision for "Other Matters Relating to Shares." Don-

---

1. The agreement states:
 [Hairmasters] and any additional businesses owned by Daniel Donnelly and operating on its premises will transfer their entire operations, staff, and clientele to the URH premises on a date initiated by Richard H. Hite .... Mr. Donnelly will agree to use his best efforts to persuade his entire staff and Hairmasters' present clientele to transfer to the URH.

nelly argues by cross petition that the latter provision supplied the measure of damages for the failure to issue stock to him under the agreement. Willis argues that this provision is inapplicable to the dispute.

To create the Urban Retreat facility, Hite located a piece of property on San Felipe Drive. River Oaks Bank owned the property. URH obtained an $800,000 renovation loan for this property and a lease from the bank. URH and WHE were initially capitalized with only $1,000 each and were not creditworthy. Willis personally pledged a $600,000 certificate of deposit to secure the loan and guaranteed URH's lease.

The Urban Retreat facility had its grand opening on December 12, 1989. Donnelly moved into the spa and began cutting hair and managing of the facility. The spa was not profitable. Donnelly testified that he "knew it wasn't making money." Willis loaned money to URH to keep the business afloat. He eventually loaned URH approximately $2 million.

Much of the trial focused on the characterization of Willis's cash infusions into the business as loans and whether Willis failed to live up to a promise to provide capital. The debate extended to battling experts.[2] Willis and Hite claimed they told Donnelly that the funds provided by Willis were loans as opposed to capital contributions. The balance sheets and the tax returns of URH describe the funds from Willis as loans, and Petitioners offered evidence that Donnelly was shown the financial records and attended meetings where the loans were discussed. While Willis testified that he agreed to "provide the capital"

or to "provide capital and funding," his testimony as a whole was clear that, with the exception of his initial $1,000 contribution, he viewed these cash infusions into URH as loans. Hite likewise viewed the cash infusions as loans. Donnelly testified that he was told that "Mike's putting in the money," but conceded that "[t]hey did not tell me it would not be a loan." Regardless, the letter agreement did not expressly obligate Willis to provide any capital contributions to URH, or to provide loans for that matter.

The parties contested whether Donnelly fully transferred his hairstyling business to Urban Retreat as promised. As described above, the letter agreement is somewhat vague as to this obligation, requiring Hairmasters and Donnelly to "transfer their entire operations, staff, and clientele" to the Urban Retreat, but also stating that Donnelly was only required to use his "best efforts" to persuade his staff and clientele to transfer to URH.

Although the spa was losing money, it generated sufficient gross revenues to trigger the provisions in the letter agreement requiring the issuance of stock to Donnelly. Because the spa was so unprofitable, however, Willis asked Donnelly if he would agree to a reduced stock interest. Willis also asked Donnelly if he would agree to sign on to some of the spa's debt. Donnelly refused. Donnelly claims that Willis unilaterally cut his salary.

Willis also asked Donnelly if he would agree to delay the transfer of stock due to him under the letter agreement, and the trial testimony confirms that both Willis

2. One of Willis's expert witnesses, an accountant, claimed that treating the cash infusions as capital contributions would mean that Willis was in effect making a gift to Donnelly once Donnelly received his stock in the corporation. One of Donnelly's expert witnesses, a tax lawyer, stated that the IRS would want to characterize the infusions as capital contributions rather than loans.

and Donnelly agreed to this delay.[3] Donnelly states in his respondent's and cross petitioner's briefs that he "agreed to wait, based on Willis's assurances that he would live up to the Letter Agreement when the business 'turned the corner.'" He made the same statement to the court of appeals. Willis wanted the transfer delayed until the spa turned the corner financially, because the delay supposedly allowed Willis to continue to take losses on the business on his personal tax returns.[4] Willis and Donnelly gave consistent and uncontradicted testimony confirming this oral agreement, and there was no evidence that, during Donnelly's employment with URH, he ever withdrew his consent to delay the transfer of stock. The stock was never issued to Donnelly.

Willis asked his wife, Francie Willis (Francie), to become involved in the spa. Willis hoped that Francie could turn the business around. Purportedly to enhance her credibility at the spa, Willis transferred all of his stock in URH to Francie in late 1990.[5]

In July 1992, Willis and Francie purchased the real estate on which the spa was located for $1.6 million. Although URH had an option to purchase the realty under its lease with River Oaks Bank, URH did not have the funds to purchase the property. Willis saw this purchase as a means of recouping some of the funds he had lent to URH to improve the premises.

Francie and Donnelly did not get along. Donnelly made plans to open a competing spa, and when Francie found out about these plans in late 1994, she testified that she confronted Donnelly and "asked him to leave and not come back," but also testified in her deposition that Donnelly left by mutual agreement.

The income statements and tax returns for URH indicate that it was never profitable during Donnelly's employment. Hite and Petitioners' accounting expert likewise testified that URH was not profitable dur-

---

3. Donnelly testified:

 Q: Well, tell me about that discussion where you specifically asked [Willis] to give you the stock.
 A: Well, I didn't make a demand on Mr. Willis, obviously, because he continually told me that we were—that there was a point—from day one, the revenues kept increasing every year; but the place still wasn't profitable. And the conversations we had ... were to the effect that once we turned the corner ... that he could at some point live up to the letter agreement....
 Q: Did you ever ask any officer or director of the corporations to issue you any stock?
 A: I did not.

 * * * * * *

 Q: Do you remember in your deposition you told me he said, "Is it all right if I don't issue you the stock at this time?"
 A: "Is it all right?" In the first—I believe it was after the first year of business.
 Q: He asked you that question?
 A: Right.
 Q: And you agreed?

 A: Yes, I did.

4. Willis testified:

 Mr. Donnelly, in one of our meetings, he mentioned to me, you know, the time frame is up for the corporation to issue him some stock.... And the way Sub S Corporations work is the losses go directly to the shareholders. And Mr. Donnelly had no, what's known as basis, in those losses and, therefore, he couldn't take any of the ... tax losses .... So I just, I asked Dan if it would be okay if I delayed issuing the stock, because the losses were still coming in, and I could get the tax benefit of those losses.
 A: Did he agree with that?
 Q: He did.

 Donnelly disputes that only Willis was qualified to take advantage of the tax losses.

5. Donnelly complains in his respondent's brief that Willis transferred his shares to Francie "in spite of Donnelly's right of first refusal under the Letter Agreement," but points to no record evidence that he had the desire or financial means to purchase Willis's shares under the terms of the agreement.

ing this period and had a negative book value. Donnelly's experts did not refute this lack of earnings, but instead focused on gross revenues. As of the time of trial in 1999, the Urban Retreat was still unprofitable according to Francie Willis and Urban Retreat's then-current general manager, although Francie admitted that she had testified in her deposition that she "wouldn't take $5 million for the Urban Retreat." The court of appeals noted that "Urban Retreat's liabilities and costs have always outstripped its tangible assets and revenue." 118 S.W.3d 10, 40.

A separate dispute arose between Willis and Donnelly. In 1992, for personal financial reasons, Donnelly asked Willis for a loan of $18,000. Willis agreed and Donnelly signed a promissory note. Willis made a second personal loan to Donnelly and the two loans were rolled into a single note. Donnelly defaulted on the note.

### B. Proceedings Below

This suit began when Willis sued Donnelly on the personal note. Donnelly filed a counterclaim and third party action against Willis, Francie, WHE, and URH, alleging several causes of action. The case proceeded to trial, and the jury ruled in favor of Willis on the promissory note. The jury found that WHE and URH breached the letter agreement by failing to convey stock to Donnelly, and that Donnelly was entitled to ten percent of the stock in WHE and fifty percent of the stock in URH under the terms of the letter agreement. The jury also found that Willis and Francie were individually liable under the letter agreement because they ratified the agreement.

The jury rejected Donnelly's tortious interference and fraud claims. It ruled in favor of Donnelly on his breach of fiduciary duty claim against Willis but found no breach of fiduciary duty by Francie. The jury was instructed that the Willises owed Donnelly a fiduciary duty, and asked whether each complied with their fiduciary duty to Donnelly. Since the jury was also instructed that a "yes" answer must be based on a preponderance of the evidence, the Willises had the burden of proving that they had complied with their fiduciary duties in order to avoid liability.

As to both the breach of contract and breach of fiduciary duty claims, the jury found damages of $1,707,684.30.

The trial court entered judgment against Donnelly on the promissory note. It entered judgment against Willis, Francie, URH, and WHE, jointly and severally, on Donnelly's breach of contract claim, and entered judgment against Willis on Donnelly's breach of fiduciary duty claim, in the amounts found by the jury. As further relief the court awarded a constructive trust in favor of Donnelly on the Urban Retreat real estate, and on fifty percent of the URH's issued and unissued stock and ten percent of WHE's issued and unissued stock. It awarded attorney's fees of $400,000 to both sides as found by the jury.

Both sides appealed. The court of appeals held that the record supported the liability of all Petitioners for breach of contract. 118 S.W.3d at 25–30. It agreed with the trial court that the Willises were liable for breach of contract because they ratified the letter agreement. Id. at 26. However, it reversed the judgment on the contract claim and remanded this portion of the case to the district court for a new trial on liability and damages, because it concluded that the jury had received an erroneous instruction on contract damages. Id. at 39–42.

The court of appeals affirmed the judgment against Willis for breach of fiduciary duty, except that it remanded the judg-

ment for constructive trust on the realty for an election of remedies. *Id.* at 30–35, 43–44. It reversed and remanded the portions of the judgment awarding attorney's fees to Willis and Donnelly. *Id.* at 44–48.

## II. Discussion

### A. Breach of Contract

#### 1. Liability of the Willises Individually

The Willises argue that their contract liability based on a ratification theory fails as a matter of law. We agree.

The jury found that the Willises had ratified the letter agreement. The court of appeals held that the Willises can be held liable for breach of contract based on this jury finding, and further held that they had waived any argument that the evidence is insufficient to support liability on the contract based on ratification.

■ Donnelly argues that the court of appeals correctly held that the Willises had waived any argument that they cannot be held liable under a ratification theory by failing to brief the issue in the court of appeals. As a general rule, a petitioner's complaint about the trial court's judgment must be raised in the court of appeals to preserve error in the Supreme Court.[6] However, we have recognized that a party should not lose its right to appeal based on an unduly technical application of procedural rules.[7] We conclude that the Willises' opening brief in the court of appeals preserved error on this issue.[8]

■ On the merits, we agree with the Willises that they are not liable for breach of the letter agreement under the undisputed facts presented. The ratification claim can only be based on a theory that the Willises expressly agreed to be bound by the agreement or impliedly ratified the agreement by retaining the benefits of the agreement. The jury was so instructed as to these alternative theories of ratifica-

---

**6.** *See Bunton v. Bentley*, 153 S.W.3d 50, 53 (Tex.2004) (citing TEX. R. APP. P. 53.2(f)).

**7.** *See Republic Underwriters Ins. Co. v. Mex–Tex, Inc.*, 150 S.W.3d 423, 427 (Tex.2004); *Briscoe v. Goodmark Corp.*, 102 S.W.3d 714, 717 (Tex.2003).

**8.** The brief essentially presented the argument that as mere shareholders of the parties to the letter agreement, the Willises cannot as a matter of law be held liable for a breach of the letter agreement under a theory of ratification or some other theory of derivative liability, arguing, *inter alia:*

> Neither Francie Willis nor Michael Willis signed the Letter Agreement. Neither ... was a party to the Letter Agreement. Thus, as a matter of law, neither ... could have breached the Letter Agreement. There is no evidence, no legally sufficient evidence, and no factually sufficient evidence that Francie Willis or Michael Willis breached the Letter Agreement.... As a matter of law, the intentional deletion of Michael Willis' signature line establishes that the par-
> ties did not intend to include Michael Willis as a party.... Furthermore, Richard Hite did not sign the Letter Agreement on behalf of Michael Willis or Francie Willis and, even if he had, there is no evidence and no finding that Mr. Hite had actual or apparent authority to do so.
>
> \* \* \* \* \* \*
>
> With regard to the Letter Agreement as it relates to the Willises, the jury was asked only whether the Willises ratified it. But ratification is simply an affirmative defense to an equitable claim for rescission.... Absent a finding that Michael Willis or Francie Willis actually breached the Letter Agreement, as a matter of law the jury's affirmative response to the ratification question ... cannot support a judgment against Michael Willis or Francie Willis for breach of contract. Furthermore, there is no evidence, no legally sufficient evidence, and no factually sufficient evidence to support ... a finding that Francie Willis or Michael Willis ratified or breached the Letter Agreement.

(Legal and record citations omitted).

tion,[9] and relying on the latter theory Donnelly argued to the jury that the Willises had ratified the agreement by accepting benefits under it.[10]

As explained above, Willis is not a party to the letter agreement, and he incorporated two companies that by law would shield him from personal liability. While his name is included in the opening sentence of the agreement, the agreement obligated URH and WHE only to issue shares to Donnelly. Moreover, at the meeting where the agreement was signed, Willis crossed his signature line off the agreement and refused to sign it.

■ As a matter of law, the corporate shield from liability should operate in these circumstances. A bedrock principle of corporate law is that an individual can incorporate a business and thereby normally shield himself from personal liability for the corporation's contractual obligations.[11] Avoidance of personal liability is not only sanctioned by the law; it is an essential reason that entrepreneurs like Willis choose to incorporate their businesses. Not surprisingly, Willis testified that his intent always "was for the corporation to be bound by this agreement and not me individually." Donnelly's own counsel, in his opening statement to the jury, argued that Willis scratched his name off the agreement because he "didn't want to have anything to do with it in an individual capacity."

In *Castleberry v. Branscum*, we stated that incorporation normally protects shareholders, officers, and directors from liability for corporate obligations, "but when these individuals abuse the corporate privilege, courts will disregard the corporate fiction and hold them individually liable." 721 S.W.2d at 271. We also stated that "[w]e disregard the corporate fiction, even though corporate formalities have been observed and corporate and individual property have been kept separately, when the corporate form has been used as part of a basically unfair device to achieve an inequitable result." *Id.* The business

---

9. The jury was instructed:

> A party's conduct includes conduct of others that the party has ratified. Ratification may be express or implied.
> Implied ratification occurs if a party, though he may have been unaware of unauthorized conduct taken on his behalf at the time it occurred, retains the benefits of the transaction involving the unauthorized conduct after he acquired full knowledge of the unauthorized conduct. Implied ratification results in the ratification of the entire transaction.

10. Donnelly's counsel argued in closing statement:

> Did Mike and Francie Willis ratify the July 10th, 1989 agreement? Ratification occurs when you retain the benefit of something you weren't an original party to.
> Now, I want y'all to think about who got this 2.2, 2.15 million dollars of Mr. Donnelly's. He don't have it. They've got it. So who kept the benefits of that agreement?

> That's a yes, yes.... Both Francie and Mike kept the benefits. Yes, they ratified the agreement.

11. *Castleberry v. Branscum*, 721 S.W.2d 270, 271 (Tex.1986) ("The corporate form normally insulates shareholders, officers, and directors from liability for corporate obligations...."); *see also Pabich v. Kellar*, 71 S.W.3d 500, 507 (Tex.App.—Fort Worth 2002, pet. denied) ("A corporation is a separate legal entity that normally insulates its owners or shareholders from personal liability."); *Aluminum Chems. (Bol.), Inc. v. Bechtel Corp.*, 28 S.W.3d 64, 67 (Tex.App.—Texarkana 2000, no pet.) ("[A] major purpose of the corporate structure is to shield its shareholders from liabilities of the corporation."); *Nat'l Hotel Co. v. Motley*, 123 S.W.2d 461, 465 (Tex. App.—Eastland 1938, writ dism'd judgm't cor.) ("[A]n individual whose business is authorized to be incorporated may incorporate such business for the sole purpose of escaping individual liability of the owner for the debts of the corporation.").

community was displeased with the flexible approach to piercing the corporate veil embraced in *Castleberry,* and in response the Legislature in 1989 narrowly prescribed the circumstances under which a shareholder can be held liable for corporate debts.[12]

■ Under current law, by statute, a shareholder "may not be held liable to the corporation or its obligees with respect to ... any contractual obligation of the corporation ... on the basis that the holder ... is or was the alter ego of the corporation or on the basis of actual or constructive fraud, a sham to perpetrate a fraud, *or other similar theory* ...."[13] The liability of a shareholder for a contractual corporate debt under this statute "is exclusive and preempts any other liability imposed for that obligation under common law or otherwise."[14] There is a statutory exception to this rule where the shareholder "caused the corporation to be used for the purpose of perpetrating and did perpetrate an actual fraud on the obligee primarily for the direct personal benefit of the" shareholder.[15] The jury rejected Donnelly's fraud claim.

There is also a statutory exception where the shareholder "expressly ... agrees to be personally liable to the obligee for the obligation."[16] We can find no evidence that the Willises expressly agreed to assume personal liability under the letter agreement. On the contrary, Francie Willis did not sign the agreement, and Donnelly admitted at trial that he never asked Francie to issue him the stock under the agreement. As to Michael Willis, Donnelly testified that in conversations Willis agreed to "live up to the letter agreement," but Donnelly did not indicate whether Willis made such statements in his individual or corporate capacity. Willis expressly provided that he would *not* be liable personally on the agreement by creating two corporations to be the obligors on the agreement, and crossing his name off the agreement during the meeting when it was signed by other parties.

■ To impose liability against the Willises under a common law theory of im-

12. *See Farr v. Sun World Sav. Ass'n,* 810 S.W.2d 294, 296 (Tex.App.—El Paso 1991, no writ) ("Largely because of the uproar in the business community over the ramifications of *Castleberry* on stockholder liability, the 71st Texas Legislature amended Article 2.21A ...."). The 1996 Bar Committee Comment to Article 2.21 of the Business Corporation Act states:

> *Castleberry,* in particular its use of constructive fraud as a basis of piercing the corporate veil, was considered by many practitioners to be incorrectly decided. Further, while questionable in the context of tort claims, the use of constructive fraud as a means of piercing the corporate veil created a cloud on the sanctity of contract and the public policy of recognizing corporations as separate entities apart from their shareholders. In response to *Castleberry,* Article 2.21 of the TBCA was amended in 1989 to establish a clear legislative standard under which the liability of a shareholder for the

obligations of a corporation is to be determined in the context of contractual obligations and all matters relating thereto.
TEX. BUS. CORP. ACT ANN. art. 2.21 cmt. (Vernon 2003) (recodified at TEX. BUS. ORGS. CODE §§ 21.223–21.226).

13. TEX. BUS. ORGS. CODE § 21.223(a) (emphasis added) (previously codified at TEX. BUS. CORP. ACT ANN. art. 2.21(A) (Vernon 2003)). The references to "alter ego" and "other similar theory" in the current statute were added in 1993 amendments to the Business Corporation Act, Act of May 7, 1993, 73d Leg., R.S., ch. 215, § 2.05(A)(2), 1993 Tex. Gen. Laws 418, 446, before Donnelly asserted his claims against the Willises in this suit.

14. *Id.* § 21.224.

15. *Id.* § 21.223(b).

16. *Id.* § 21.225(1).

plied ratification because they accepted the benefits of the letter agreement would contravene the statutory imperative that, absent actual fraud or an express agreement to assume personal liability, a shareholder may not be held liable for contractual obligations of the corporation. We hold that characterizing the theory as "ratification" rather than "alter ego" is simply asserting a "similar theory" of derivative liability that is covered by the statute.

■■■ Even absent the statutory impediment to Donnelly's theory of liability, ratification is a common law doctrine that simply does not fit the factual circumstances presented. Generally, ratification is a doctrine of agency law, and allows a principal to be bound by an agent's unauthorized contract in circumstances where the principal becomes aware of the contract and retains benefits under it.[17] Ratification, however, presupposes that the principal has an agent who, by agreement, is authorized to act on the principal's behalf. In the pending case, URH and WHE were not agents of Willis authorized to act on Willis's behalf and bind him to contracts. Quite the opposite, URH and WHE were separate corporations created to *prevent* the imposition of contractual liabilities on Willis personally. Again, the law allows an individual in these circumstances to incorporate a business and thereby protect himself from personal liability.

The court of appeals quoted *Hays v. Marble*, 213 S.W.2d 329 (Tex.App.—Amarillo 1948, writ dism'd), for the proposition that "[o]ne may ratify the act or contract of another ... whether the other was his agent and exceeded his authority as such or was not his agent at all." *Id.* at 333. Assuming that *Hays* was correctly decided, we find it inapposite. In that case, one heir entered into a contract to sell property on behalf of all the heirs to the property and subsequently persuaded the other heirs to sign the deed. The court held that the other heirs had ratified the contract. In the pending case, Willis expressly *refused* to be bound personally by the contract, since he created separate corporations to assume liability on the letter agreement and crossed his name off the agreement when it was signed by others.

■■■ Donnelly argues that the corporate separateness of URH should be disregarded because the letter agreement indicates that URH did not exist at the time the agreement was signed, and instead refers to "Urban Retreat of Houston, Inc., a corporation *to be formed* and originally owned by principals of Willis/Hite Enterprises, Inc." The corporate records of URH reveal, however, that it existed before the letter agreement was signed.[18] It is true that WHE is also a party to the letter agreement and was not incorporated until August 1989, shortly after the letter agreement was signed.[19] However, in

17. *See Land Title Co. of Dallas, Inc. v. F.M. Stigler, Inc.*, 609 S.W.2d 754, 756 (Tex.1980) ("Ratification may occur when a principal, though he had no knowledge originally of the unauthorized act of his agent, retains the benefits of the transaction after acquiring full knowledge.").

18. According to the corporate records, Willis/Hite Enterprises, Inc. was incorporated in March 1989, before the letter agreement was signed in July 1989, and was renamed Urban Retreat of Houston, Inc. in August 1989.

19. Willis and Hite might have intended the company that existed at the time the letter agreement was signed to serve as the holding company for all Urban Retreat facilities, but later renamed that company and made it the operating company for the first Urban Retreat facility, and created a second company to serve as the holding company. Any uncertainties as to the intent of the original shareholders of the two corporations in this regard, however, is irrelevant to our analysis.

these circumstances we think the better rule is that a contracting party must look to the unformed corporation for performance. The contract was made in the name of two corporations, stated that one of the corporations has not been formed, and the individual "promoter," assuming Willis can be characterized as such, struck his name from the agreement, thus indicating that he would not be held personally liable under it.[20]

## 2. Contract Damages

The court of appeals held that the jury was improperly instructed on the measure of damages on the contract claim. Reasoning that liability was contested, it held that the proper remedy for the erroneous instruction was to remand the case for a new trial. It further held that "[t]he rules of appellate procedure do not permit a new trial solely on unliquidated damages if liability is contested," 118 S.W.3d at 42, and

accordingly remanded the contract claim for a new trial on liability and damages.

As explained above, the Willises are entitled to a rendition of judgment on the contract claim. The jury also held WHE and URH liable on the contract and awarded damages against them. A new trial is required for the contract claim against these corporations if the court of appeals' analysis as to them is correct.

 The court of appeals concluded that the trial court incorrectly instructed the jury that the measure of contract damages included the value of Donnelly's stock ownership under the provision of the letter agreement for "Other Matters Relating to Shares."[21] This provision places a value on the stock equal to the appraised value of real estate plus the previous twelve months of gross revenue,[22] a measure more favorable to Donnelly than the value of shares under the Termination provision of the letter agreement.[23] The court of

---

**20.** *See Fish v. Tandy Corp.*, 948 S.W.2d 886, 897 (Tex.App.—Fort Worth 1997, pet. denied) (stating that a promoter who enters into a contract is personally liable on a contract "unless there is an agreement with the contracting party that the promoter is not liable," or "unless the contract is made in the name and on the credit of the proposed corporation and the contracting party knows that the corporation does not yet exist"); *Aloe Ltd. v. Koch*, 733 S.W.2d 364, 366 (Tex.App.—Corpus Christi 1987, no writ) (stating that a promoter is not liable "where the contract is made in the name and solely on the credit of the proposed corporation and the contracting party knows that the corporation does not yet exist").

**21.** The jury was instructed that the measure of damages for breach of the letter agreement consisted of the amount of money due Donnelly for salary and compensation under the agreement, and the value of stock ownership as set forth in the agreement under "other matters relating to shares." Donnelly offered evidence on each of these components of damages.

**22.** The Other Matters Relating to Shares provision states in part:

> Mr. Donnelly will agree to allow the other shareholders of URH and [WHE] a first right of refusal to purchase his shares of URH and [WHE] and will agree to a combination of the Urban Retreat companies when contacted by the majority shareholders of [WHE] which shall include an exchange of stock based on a valuation of the companies according to the following formula: "Book Value of Owners' Equity = Real Estate Appraised at Market Value Plus Previous Twelve (12) Months Gross Revenues." ... The Shareholders of URH and [WHE] agree to allow Mr. Donnelly a first right of refusal to purchase their share of URH and [WHE] based on a valuation of the companies according to the following formula: "Book Value of Owners' Equity = Real Estate Appraised at Market Value Plus Previous Twelve (12) Months Gross Revenue."

**23.** The Termination provision states is part:

> After twelve (12) months of employment, if Mr. Donnelly is terminated, Mr. Donnelly

appeals held that the correct measure of damages was the fair market value of the stock at the time of Donnelly's termination.[24]

 Donnelly argues by cross petition that the measure of damages given in the jury charge is correct. He first argues that Petitioners waived any complaint about the measure of contract damages in the trial court. We disagree. A complaint about a defective jury instruction is waived "unless specifically included in the objections" to the charge. TEX. R. CIV. P. 274. Petitioners specifically objected to the contract damages instruction on grounds that it was erroneously based on the Other Matters Relating to Shares provision.[25]

 On the merits, we agree with the court of appeals that this provision does not set out the correct measure of damages for breach of contract in this case. The construction of an unambiguous con-

tract is a question of law for the court. *MCI Telecomms. Corp. v. Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 650 (Tex.1999). This provision is not a liquidated damages provision and unambiguously applies to only two situations: (1) it grants a right of first refusal to the original shareholders, allowing them to control ownership in the corporation in the event Donnelly wants to sell his shares, and grants a corresponding right of first refusal to Donnelly if the original shareholders want to sell their shares; and (2) it applies when there is an exchange of stock due to a combination of one or more Urban Retreat companies. Neither situation arose in this case.

 The jury was instructed on the wrong measure of damages. The charge error "probably caused the rendition of an improper judgment" warranting reversal. TEX. R. APP. P. 44.1(a)(1). It allowed Donnelly's experts to opine, and his coun-

would likewise be required to sell his shares of URH and [WHE] to those companies and would receive book value of such share or the value of the stock as determined by multiplying two times prior year's earnings computed under Generally Accepted Accounting Principles, whichever is greater. "Book Value" is defined as the assets minus liabilities computed according to Generally Accepted Accounting Principles.

24. Neither side complains that the Termination provision should apply in lieu of the fair market value of the stock at the time of Donnelly's termination. Petitioners argued in the court of appeals that the Termination provision provided the correct measure of damages for breach of contract, but argue to us that the fair market value measure adopted by the court of appeals is correct. We agree that the fair market value of the stock is the correct measure of contract damages, essentially for the reasons explained by the court of appeals in its discussion of contract damages and limitations, 118 S.W.3d at 28, 39–41, and because the Termination provision by its terms would only apply if URH and WHE had, in compliance with their contractual ob-

ligations, issued stock to Donnelly, in which case Donnelly would "be required to sell his shares" back to the those companies.

25. The trial court heard a motion for directed verdict immediately followed by objections to the charge. In moving for directed verdict Petitioners' counsel argued:

[T]here is no evidence to support any damage recovery by Mr. Donnelly on any of his liability claims. All of Mr. Donnelly's evidence relates to the formula contained in the Other Matters Relating to Shares provision of the contract.... As a matter of law, the Other Matters Relating to Shares clause applies only when there is the exercise of a right of first refusal or when the mandatory rollup clause or provision is triggered.

In objecting to the contract damages instruction, counsel argued: "Damages in this case are not properly determinable under the Other Matters Relating to Shares provision of the contract; and therefore, because this question instructs the jury to apply the Other Matters Relating to Shares provision, it erroneously instructs the jury on the wrong measure of damages."

sel to argue to the jury, that damages should include (1) the value of real estate that URH and WHE did not own, and (2) the gross revenues of URH, which were substantial, without regard to URH's negative earnings and negative book value. We agree with the court of appeals that, as to WHE and URH, a remand for new trial was the appropriate remedy,[26] and a remand for new trial on both damages and liability was warranted.[27]

## B. Breach of Fiduciary Duty

▆▆▆▆▆ The trial court instructed the jury that the Willises owed Donnelly a fiduciary duty. The jury found that Michael Willis breached his fiduciary duty and that this conduct proximately caused damages to Donnelly of approximately $1.7 million. The trial court awarded judgment for this amount, and the court of appeals affirmed. We agree with Willis that on this record, as a matter of law, he cannot be subjected to liability for breach of fiduciary duty.[28]

Donnelly argues for the existence of a fiduciary relationship based on an alleged fiduciary duty of a majority shareholder to a minority shareholder. He argued at trial that breaches of fiduciary duty occurred when Willis failed to make capital contributions or treated cash infusions into URH as loans rather than capital contributions;

when the Willises purchased the real estate on which the Urban Retreat was located, despite an option URH had in its lease to purchase the property; and when Michael Willis transferred his stock to his wife Francie.[29]

A host of legal questions are raised by this claim, including the issues of (1) whether a majority shareholder in a closely held corporations owes a minority shareholder a general fiduciary duty under Texas law, (2) whether a distinction must be drawn between breach of a duty owed to a minority shareholder qua shareholder and malfeasance by a majority shareholder, such as usurpation of a corporate opportunity, that would only give rise to a shareholder derivative action on behalf of the corporation, (3) whether on this record, assuming the existence of a fiduciary duty, any of the alleged wrongful conduct by the Willises, such as the act of loaning money to the corporation rather than simply giving cash to the corporation as a capital contribution, amounted to a breach of fiduciary duty under Texas law, and (4) whether Texas law recognizes a doctrine of equitable title to stock and the contours of such a doctrine.

We do not explore these issues, but hold instead that the breach of fiduciary duty claim in the pending case fails because all the alleged breaches of fiduciary duty occurred before Donnelly became a share-

---

**26.** *See Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 817 (Tex.1997) (holding that remand for new trial is proper remedy for defective damages instruction).

**27.** *See* TEX. R. APP. P. 44.1(b) ("The [appellate] court may not order a separate trial solely on unliquidated damages if liability is contested.").

**28.** Donnelly argues that Willis did not preserve error on this complaint in the district court or the court of appeals. Willis moved for a directed verdict and argued to the court of appeals that the breach of fiduciary duty claim should fail as a matter of law because

there was no evidence of a majority-minority shareholder relationship that could serve as a basis for recognizing a fiduciary duty, or any other legally recognized basis for such a duty, and because Donnelly was never a shareholder of URH or WHE. Willis preserved error.

**29.** These alleged breaches of fiduciary duty were also given by Donnelly in his appellee's brief to the court of appeals, as examples of fiduciary duty breaches that were not barred by limitations. The court of appeals relied on these alleged breaches in rejecting the limitations defense to this claim. 118 S.W.3d at 35.

holder and before he was entitled to shareholder status. There can be no liability for alleged breaches of a duty that occurred before the duty arose.

■ Willis had never met Donnelly prior to the time the two met about Donnelly's participation in the Urban Retreat business. The two were experienced businessmen. Donnelly, Willis, and Hite participated in arms-length discussions that resulted in the letter agreement. Generally, "while a fiduciary relationship or confidential relationship may arise from the circumstances of a particular case, to impose such a relationship in a business transaction, the relationship must exist prior to, and apart from the agreement made the basis of the suit." *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 177 (Tex.1997). There was no evidence that, after the agreement was signed, Donnelly developed a close personal relationship of trust and confidence that could give rise to a fiduciary relationship.[30]

The only conceivable basis for a fiduciary relationship in this case would be a duty owed by a majority shareholder to a minority shareholder. Assuming without deciding that such a relationship can give rise to a general fiduciary duty, we decline

to recognize the existence of such a duty on this record. Donnelly never actually became a shareholder of URH or WHE, and indeed his contract claim is based on the alleged failure of these corporations and the Willises to convey stock owed to him under the letter agreement.

Further, as detailed above, the trial testimony and Donnelly's own briefing confirm that Willis and Donnelly agreed to delay the transfer of Donnelly's stock until the business "turned the corner." Willis and Donnelly both gave uncontradicted testimony of the existence of this understanding.[31] The alleged breaches of fiduciary duty occurred before Donnelly was terminated in late 1994. At that time the spa was still losing money. Only after Donnelly was asked to leave did he treat the contract as terminated and bring suit alleging breach of contract and other claims. Until that time, Donnelly concedes in his briefing to this Court and the court of appeals that he "agreed to wait, based on Willis's assurances that he would live up to the Letter Agreement when the business 'turned the corner,'" and that he agreed to "await performance until satisfied that the contract must be terminated for the sake of litigation." [32] The court of appeals also noted "the undisputed evi-

---

**30.** *See id.* at 176 ("An informal relationship may give rise to a fiduciary duty where one person trusts on and relies on another, whether the relation is a moral, social, domestic, or purely personal one.").

**31.** *See supra* notes 3–4 and accompanying text. This evidence, in our view, is consistent with the jury's answer to Question No. 6, which asked whether the failure to comply with the letter agreement was excused because Donnelly waived compliance with the agreement. The jury answered "no." This question defined a waiver as "an intentional surrender of a known right or intentional conduct inconsistent with claiming the right." The oral understanding, in our view, was not an intentional abandonment or surrender of Donnelly's right to the stock so as to consti-

tute a waiver, but a mere postponement of the obligation, and the jury could have so found. As the court of appeals noted in its discussion of the waiver defense, Willis "merely delayed issuing the stock." 118 S.W.3d at 27. The jury's acceptance of the existence of the oral agreement can also explain its answer to Question No. 7, concerning the limitations defense, where the jury answered "no" to the question of whether the failure to comply with the letter agreement occurred prior to August 24, 1991. By the original terms of the letter agreement, WHE and URH would have been obligated to transfer stock to Donnelly in 1990.

**32.** This latter statement was made in Donnelly's appellee's brief in the court of appeals, in

dence that deadlines [for the transfer of stock] were postponed so that the Willises could reap tax benefits and [URH] could 'turn the corner.' ... Donnelly relied on Willis's assurances and accepted the delays." 118 S.W.3d at 28. In addition, the agreement to delay the transfer of stock preceded the beginning of the statute of limitations period for breach of fiduciary duty, so there was no time within the limitations period where this agreement was not in effect.[33]

We hold that in these circumstances, where a plaintiff is suing for breach of fiduciary duty based on his purported status as a minority shareholder, but (1) no transfer of stock to the purported minority shareholder ever occurred, (2) the purported majority and minority shareholders were both experienced businessmen who had never met prior to the business arrangement at issue, (3) the two were conducting business under a written agreement that expressly required corporate entities, not the majority shareholder, to issue the stock, and (4) the two were also operating under an oral agreement to postpone the transfer of stock when the alleged breaches of fiduciary duty occurred, Texas law does not recognize the existence of a fiduciary duty. Our holding is consistent with the general reluctance of Texas law, described above, to ignore corporate formalities and hold an individual defendant liable where the plaintiff has agreed to conduct business with a corporation. It is also consistent with our previously recognized reluctance to recognize fiduciary relationships, especially in the commercial context. "In order to give full force to contracts, we do not create such a relationship lightly." *Schlumberger*, 959 S.W.2d at 177.

## C. Other Issues

Petitioners argue that the rate of prejudgment and post-judgment interest

---

response to a statute of limitations argument. In context, Donnelly argued:

> A cause of action for breach of contract accrues only if the injured party elects to treat the contract as terminated.... A party to a contract is allowed to cooperate with the other party, continue performing the contract, and await performance until satisfied that the contract must be terminated for the sake of litigation. A contrary rule would require contracting parties to interrupt performance and sue a party who may yet perform.... The termination of Mr. Donnelly's employment at the Urban Retreat was the first time the Willises "made clear their intent never to comply with the agreement."

**33.** The statute of limitations for a breach of fiduciary duty claim in this case is at most four years. *See* TEX. CIV. PRAC. & REM. CODE § 16.004(a)(5) (four-year statute of limitations for breach of fiduciary duty); *Rice v. Louis A. Williams & Assocs., Inc.*, 86 S.W.3d 329, 335–36 (Tex.App.—Texarkana 2002, pet. denied) (applying section 16.004(a)(5) retroactively). Donnelly's third party action against Willis was filed in August 1995, so the limitations period extends at most to August 1991. Any breach of fiduciary duty claim for conduct occurring before August 1991 would be barred by limitations. Donnelly thought the agreement to delay the stock transfer occurred "after the first year in business." The letter agreement was signed in July 1989 and the Urban Retreat grand opening was in December 1989, so Donnelly at most testified that the agreement occurred after mid-December 1990. Willis testified that the agreement was in place in 1990, stating that he was grateful to Donnelly in 1990 for allowing him to delay the stock transfer so that he could take full advantage of the tax losses on the business in 1990. Willis also testified that he had documents prepared that would cap Donnelly's stock ownership, and that Donnelly orally agreed to delay the stock transfer either simultaneously or before the preparation of these documents. These documents were never signed and have February and March 1991 dates. Hence, the totality of evidence indicates that the agreement to delay the transfer of stock was in place by March 1991 at the latest, before the start of the relevant limitations period.

awarded by the trial court should be reduced in light of a statutory change in the interest rate on judgments. They also complain that the trial court erred in imposing a constructive trust on the stock allegedly due Donnelly under the letter agreement, and the real estate owned by the Willises on which the Urban Retreat property is located. Because of our disposition of other issues discussed above, there is no longer a judgment of liability against any Petitioner on which to award interest or a constructive trust. Because the Willises are entitled to a take-nothing judgment on all claims, we reverse and render the portion of the judgment imposing a constructive trust on the real estate they own and on any issued stock in WHE or URH that they own. As to a contract claim against WHE and URH for a constructive trust on unissued stock, the corporations make no persuasive argument that the trial court could not order such relief if Donnelly properly pleads and elects such relief, but this is sue is moot until such time as Donnelly secures a judgment on the surviving contract claim against WHE or URH.

### III. Conclusion

We reverse in part the court of appeals' judgment and render a take-nothing judgment on all of Donnelly's claims against the Willises. We affirm the court of appeals' judgment insofar as it remanded the case for a new trial on the contract claim against WHE and URH. We remand the case to the district court for further proceedings consistent with this opinion.

Justice O'NEILL, Justice BRISTER, and Justice MEDINA did not participate in the decision.