# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-05-00770-CV

**Appellant, Ross Featherston// Cross-Appellants, Robert N. Weller,
Tom Keilman & Son Auctioneers, Inc., Bud Keilman, and Tom Keilman**

**v.**

**Appellees, Robert N. Weller, Tom Keilman & Son Auctioneers, Inc.,
Bud Keilman and Tom Keilman// Cross-Appellee Ross Featherston**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 261ST JUDICIAL DISTRICT
## NO. GN303353, HONORABLE GISELA D. TRIANA-DOYAL, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Ross Featherston appeals from a jury verdict on several claims he brought against Tom Keilman & Son Auctioneers, Inc. ("Keilman & Son"), Bud Keilman, Tom Keilman (collectively, "the Keilmans"), and Robert N. Weller. Featherston purchased a historical pistol at a Keilman & Son auction. When the pistol's authenticity proved less certain than advertised, he asked the Keilmans to return his money. They refused, and he sued under theories of fraud, negligent misrepresentation, negligence, and the Texas Deceptive Trade Practices Act ("DTPA"). *See* Tex. Bus. & Com. Code Ann. §§ 17.41-.63 (West 2002 & Supp. 2008). Featherston recovered under only his negligence theory. He appeals the quantity of that recovery as well as his failure to recover anything under the DTPA. The Keilmans cross-appeal, arguing that Featherston should

have recovered nothing at all because he agreed to buy the pistol "as is."  We will affirm the trial court's judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

In 2003, Ross Featherston, himself a professional auctioneer, learned that Keilman & Son would be auctioning a pistol that had purportedly belonged to William F. "Buffalo Bill" Cody.  Keilman & Son published a pre-auction catalog that contained a description of the pistol and a copy of the pistol's "provenance," i.e., the collection of documents that purportedly illustrated the pistol's authenticity.  The front page of the catalog listed "CONDITIONS OF SALE" for the auction that included the following:

- "The auctioneer assumes no responsibility for the authenticity or condition of any item sold."

- "All merchandise will be sold 'as is, where is' 'no warranties, no guarantees' in accordance with the conditions of the sale."

The catalog's affirmative description of the pistol as "Buffalo Bill Cody's Colt" differed from the more accurate description that Keilman & Son had used in an earlier catalog. Keilman & Son had previously auctioned the same pistol in 1996 after advertising it as "supposedly" once belonging to Cody.  Robert Weller purchased the pistol under that description in 1996, but when he consigned the pistol back to Keilman & Son for inclusion in its 2003 auction he omitted the word "supposedly" when he described the pistol in his transmittal letter.  Keilman & Son maintained that omission in its 2003 pre-auction catalog and internet "press releases"; the latter simply described the pistol as having been "presented to Buffalo Bill in 1909."

2

Clint Baermann, an antique firearms expert whom the Keilmans regularly hired to conduct research on auction items, penned the 2003 catalog description of the Cody pistol. Besides examining the provenance that came with the pistol, Baermann independently researched the pistol's history in determining how to describe the pistol in the catalog.

On the day of the auction, Featherston personally inspected the pistol and a copy of its provenance. To bid on the pistol, Keilman & Son required Featherston to sign a "bid agreement" and obtain a "bid card." The bid agreement was imprinted with "TERMS" that included the following: "I, the purchaser agree that items are sold AS IS, WHERE IS and with all Faults. NO WARRANTY OR GUARANTEE IS EXPRESSED OR IMPLIED AND EACH ITEM IS THE SOLE RESPONSIBILITY OF THE PURCHASER FROM THE MOMENT THE AUCTIONEER DECLARES THE ITEM SOLD." Similarly, the bid card was imprinted with "Terms of Sale" that included the following: "All descriptions of items are believed to be correct as described by owner. No warranties or guarantees expressed or implied on anything sold at this sale. Examine items before bidding." The bid card was also imprinted with "SOLD AS IS—WHERE IS."

The pistol was one of several hundred items that Keilman & Son auctioned off on the day in question. When the pistol came up for bid, the auctioneer, Tommy Carson, a Keilman & Son employee, slowed the auction's rapid pace for the first time. Tom Keilman asked Clint Baermann to speak to the audience about the pistol. Baermann did so and made several representations of fact, including:

- Nebraska senator George Norris gave the pistol to Cody at a "Buffalo Bill Cody Day" event in 1909.

3

- The emperor of Japan was present when Cody received the pistol.

- Cody used the pistol in his "Wild West Show" from 1909 until 1917.

- The pistol was "the real deal. [It was] Buffalo Bill's gun."

- The documentary evidence linking the pistol to Cody "goes on forever."

In fact, each of these representations was either false or unverified. Auctioneer Carson added representations of his own, saying that "we have the documentation and all the paperwork that goes with it" and "[g]uarantee you won't find one with more documentation to back it up. Goes all the way back. It's the right thing, the real deal, and the right kind." Tom and Bud Keilman stood nearby as Baermann and Carson made these representations and did nothing to indicate disagreement with them.

Bidding on the pistol began immediately after Baermann and Carson spoke. Featherston won the pistol for $22,000, which included a $20,000 bid and a $2,000 buyer's premium.[1] Featherston obtained a receipt when he paid for the pistol that described it unqualifiedly as "Buffalo Bill Cody's Colt" and contained the following language: "Purchaser agrees above items were sold AS IS, WHERE IS and with all faults. No WARRANTY or Guarantee is expressed or implied and each item is the sole responsibility of the purchaser from the MOMENT the AUCTIONEER DECLARES THE ITEM SOLD."

A few weeks after buying the pistol, Featherston decided to sell it. He contacted Greg Martin Auctions of San Francisco, which had experience auctioning Cody-related items.

---

[1] A "buyer's premium" is a sum that goes directly to the consignor without the auction house subtracting a commission.

4

Featherston sent the pistol and its provenance to Greg Martin Auctions for evaluation. Greg Martin Auctions examined them and informed Featherston that the provenance was problematic: it contained a transportation manifest that purported to be from a Wells Fargo express company in 1921, but the company in question actually went out of business in 1918. As a result, the pistol's authenticity was questionable, and the pistol was worth only $2,000.[2]

Upon learning this, Featherston tendered the pistol to Keilman & Son and asked for a refund. Tom Keilman refused to give him one. Keilman informed Robert Weller of the situation, but Weller declined to get involved. Featherston never contacted Weller directly, and Weller never took it upon himself to offer Featherston a refund of his auction proceeds.

In August 2003, Featherston sued the Keilmans, Weller, and Baermann for fraud, negligence, negligent misrepresentation, and violations of the DTPA. The suit proceeded through trial, though Featherston nonsuited Baermann before it went to the jury. *See* Tex. R. Civ. P. 162. The jury found that no defendant had committed fraud or negligent misrepresentation, but it found that Keilman & Son, Bud Keilman, and Baermann had acted negligently and had violated the DTPA (albeit unknowingly and unwittingly). *See* Tex. Bus. & Com. Code Ann. § 17.50 (West Supp. 2008). In addition, the jury found that Weller had ratified the other defendants' actions and statements. The jury found, however, that those defendants had an affirmative defense to their DTPA violations, namely that they had notified Featherston in writing of their reliance on written representations

---

[2] Later investigations revealed that other documents in the provenance were likely inauthentic as well, possibly even forged.

by third parties. *See id.* § 17.506 (West 2002). Thus, Featherston recovered under only his negligence theory.

The jury calculated Featherston's damages at $18,000. It assigned thirty-four percent of the responsibility for these damages to Keilman & Son, thirty-three percent to Baermann, and thirty-three percent to Featherston himself. Because Featherston had nonsuited Baermann, the court awarded Featherston only Keilman & Son's thirty-four-percent share of his damages, or $6,120.

Featherston filed a motion asking the court to disregard the jury findings on his DTPA claims. He also filed a motion to modify the final judgment to include actual damages, prejudgment interest, and attorney's fees against Weller, Keilman & Son, and Bud Keilman. The trial court denied both motions. The Keilmans filed their own motion to disregard jury findings, arguing that the "as is" language in the parties' contract precluded recovery. The trial court denied that motion as well. Featherston and the Keilmans both appealed.

## STANDARD OF REVIEW

We review the denial of a motion to disregard jury findings as a legal sufficiency challenge. *See Excel Corp. v. McDonald*, 223 S.W.3d 506, 508 (Tex. App.—Amarillo 2006, pet. denied). We will sustain such a challenge only when no more than a scintilla of evidence supported the jury's finding. *See Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997). More than a scintilla of evidence exists when reasonable and fair-minded people could differ in their conclusions. *Id*. We review the evidence in a light that tends to support the jury's finding and disregard all evidence and inferences to the contrary unless doing so would be unreasonable. *See City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005).

6

We review the denial of a motion to modify a judgment for abuse of discretion. *See Wagner v. Edlund*, 229 S.W.3d 870, 879 (Tex. App.—Dallas 2007, pet. denied). Under this standard, we may only reverse if the trial court acted unreasonably or in an arbitrary manner, without reference to guiding rules or principles. *See Beaumont Bank, N.A. v. Buller*, 806 S.W.2d 223, 226 (Tex. 1991). A trial court does not abuse its discretion if probative evidence supports its decision. *See Hisaw & Assocs. Gen. Contractors, Inc. v. Cornerstone Concrete Sys.*, 115 S.W.3d 16, 20-21 (Tex. App.—Fort Worth 2003, pet. denied).

## DISCUSSION

### *Featherston's Points of Error*

On appeal, Featherston raises six points of error that reduce to three issues: (1) whether Featherston should have recovered on his DTPA claims; (2) whether Featherston should have recovered from Weller given Weller's ratification of the other defendants' acts; and (3) whether Featherston should have recovered prejudgment interest on his negligence claim. We address these issues in turn.

### *Featherston's DTPA Claim*

The parties do not dispute the jury's finding that the Keilmans engaged in a "false, misleading, or deceptive act or practice" that could support recovery under the DTPA. Rather, the parties dispute whether the Keilmans established an affirmative defense to Featherston's DTPA claims. Featherston claims that they did not. Because the jury found that they did, Featherston can

7

only prevail on this issue if he shows that the jury's finding was supported by no more than a scintilla of evidence. *See Havner*, 953 S.W.2d at 711.

Section 17.506 of the DTPA provides an affirmative defense to DTPA claims if a defendant:

> proves that before consummation of the transaction he gave reasonable and timely written notice to the plaintiff of the defendant's reliance on . . . . written information relating to the particular goods or service in question obtained from another source if the information was false or inaccurate and the defendant did not know and could not reasonably have known of the falsity or inaccuracy of the information.

Tex. Bus. & Com. Code Ann. § 17.506(a)(2). Here the jury found that the Keilmans, Tommy Carson, and Clint Baermann gave Featherston written notice of their reliance on written information provided by others. Featherston argues that the evidence did not support this finding. We disagree.

The Keilmans included the Cody pistol's provenance in their pre-auction catalog and displayed it alongside the pistol at the auction. This constitutes more than a scintilla of evidence that the Keilmans gave Featherston written notice of their reliance on the provenance. Featherston seems to argue that 17.506 requires a formalistic recitation—something along the lines of a written disclaimer stating, "we are relying on written information from another source." The statute, however, requires only "written notice." We believe that the copies of the documents in the provenance could have constituted "written notice." *Cf. id*. § 1.201(b)(43) (West 2009) (anything intentionally reduced to tangible form qualifies as "written"). In any event, whether the provenance constituted written notice was a question of fact for the jury to decide. *See O'Ferral v. Coolidge*,

228 S.W.2d 146, 148 (Tex. 1950) (notice is fact question unless ordinary minds could not differ as to proper conclusion to be drawn from evidence). Because we cannot say it was unreasonable for the jury to conclude that the provenance constituted written notice, the trial court properly upheld the jury's finding. *See Havner*, 953 S.W.2d at 711.

Changing tack, Featherston cites *Glassman v. Pena*, No. 08-02-00541-CV, 2003 Tex. App. LEXIS 10643, at *4 (Tex. App.—El Paso Dec. 18, 2003, no pet.) (mem. op.), for the proposition that defendants can only invoke section 17.506 if they were "merely acting as conduits of information provided to them by others." Even if *Glassman* had precedential value in this Court, it does not actually stand for that proposition. The contract at issue in *Glassman* happened to state that the defendants there were only acting as conduits, but that fact was irrelevant to the court's holding. *See id*. at *13-14.

Featherston goes on to claim, without argument or citation, that defendants can only invoke section 17.506 if their deceptive representations are based "solely" on written information from others. This argument is waived because it is unsupported by argument or citation to relevant authority. *See Sweed v. City of El Paso*, 195 S.W.3d 784, 786 (Tex. App.—El Paso 2006, no pet.). But even if it were not, section 17.506 plainly does not include this requirement. We therefore decline to impose it. *See City of Rockwall v. Hughes*, 246 S.W.3d 621, 625-26 (Tex. 2008) (courts must generally give statutes their plain meaning).

Finally, Featherston argues that 17.506 shields defendants from liability only if the third-party written information on which they rely is the "sole" producing cause of the plaintiff's harm. The statute states:

9

> In asserting a defense under Subdivision (1), (2), or (3) of Subsection (a) of Section 17.506 above, the defendant shall prove the [third-party] written information was *a* producing cause of the alleged damage [to plaintiff]. A finding of one producing cause does not bar recovery if other conduct of the defendant not the subject of a defensive finding under Subdivision (1), (2), or (3) of Subsection (a) of Section 17.506 above was a producing cause of damages of the plaintiff.

Tex. Bus. & Com. Code Ann. § 17.506(b) (emphasis added). We interpret this provision to mean that even if some of a defendant's injurious conduct is subject to the affirmative defense of section 17.506, the plaintiff can still recover if the defendant has engaged in other injurious conduct that is not. Here, the jury explicitly and reasonably found that the written information the Keilmans relied on was a producing cause of Featherston's harm. The jury did not, however, explicitly find that any producing cause existed that was not similarly subject to the affirmative defense of section 17.506. As plaintiff, Featherston bore the burden of procuring such a finding.[3] Under these circumstances, we cannot say the trial court erred in applying section 17.506 and denying recovery under the DTPA.

In sum, Featherston has not demonstrated that the jury's DTPA findings were unsupported by more than a scintilla of evidence. We therefore affirm the trial court's denial of Featherston's motion to disregard the jury's DTPA findings.

---

[3] The Keilmans bore the burden of establishing every element of their affirmative defense under section 17.506. *See Texas Farmers Ins. Co. v. Murphy*, 996 S.W.2d 873, 879-80 (Tex. 1999). This burden did not require them to establish the absence of producing causes that could create liability despite that defense. Section 17.506(b) makes clear that the existence of an affirmative defense under the section and the existence of producing causes not subject to it are two separate questions.

***Featherston's Recovery from Weller***

Featherston argues that regardless of whether he recovered from the Keilmans under the DTPA, he should have recovered from Weller on both his DTPA and negligence claims because Weller ratified the other defendants' harmful acts. We disagree.

Regarding recovery under the DTPA, as just discussed, the jury reasonably found that the Keilmans and Baermann had an affirmative defense to Featherston's DTPA claims. Featherston cites no authority indicating that Weller should nevertheless be liable for the other defendants' DTPA-related acts. In fact, such a result would conflict with established case law. *See DeWitt v. Harris County*, 904 S.W.2d 650, 654 (Tex. 1995) (primary wrongdoer's affirmative defense shields secondary wrongdoers from derivative liability); *Willis v. Donnelly*, 199 S.W.3d 262, 273 (Tex. 2006) (ratification is form of derivative liability). *Accord Green v. American Gen. Ins. Co.*, 354 S.W.2d 616, 617 (Tex. Civ. App.—Fort Worth 1962, writ ref'd n.r.e.) (insurer cannot be derivatively liable for harm caused by insured if insured is acquitted of liability).

Regarding recovery under negligence, the trial court did not abuse its discretion in denying Featherston any recovery from Weller. The jury expressly found that Weller had zero responsibility for Featherston's damages. That finding was reasonable given Weller's attenuated role in the dispute. Thus, denying recovery from Weller on the basis of that finding was proper. *See* Tex. Civ. Prac. & Rem. Code Ann. § 33.013(a) (West 2008) (a defendant "is liable to a claimant only for the percentage of the damages found by the trier of fact equal to that defendant's percentage of responsibility").

11

***Featherston's Recovery of Prejudgment Interest***

Finally, Featherston argues that the trial court erred in not awarding him prejudgment interest. We disagree. The award of prejudgment interest is discretionary with the trial court. *See Wilmer-Hutchins Indep. Sch. Dist. v. Smiley*, 97 S.W.3d 702, 706 (Tex. App.—Dallas 2003, pet. denied). In cases other than wrongful death, personal injury, or property damage, general principles of equity determine whether prejudgment interest is warranted. *See Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 528 (Tex. 1998). Here, the trial court did not abuse its discretion in deciding that equity did not dictate an award of prejudgment interest. Though the trial court did not enumerate its reasons for refusing to award prejudgment interest, the record contains ample evidence on which that decision could have been rationally based. For example, the Keilmans testified without opposition that they steadfastly believed the pistol at issue was actually Cody's. In keeping with that fact, the jury found that the Keilmans did not deceive Featherston knowingly or intentionally. In such circumstances, we cannot say that equity absolutely compelled an award of prejudgment interest.

***The Keilmans' Point of Error***

The Keilmans contend that Featherston agreed to purchase the Cody pistol "as is, where is." They further contend that the trial court erred in not declaring, as a matter of law, that Featherston's "as is" purchase prevented him from recovering anything.

Because the Keilmans sought to avoid liability on the basis of "as is" contract language, they bore the burden of establishing that such language occurred in a contract that bound the parties. *See Compass Bank v. MFP Fin. Servs., Inc.*, 152 S.W.3d 844, 851 (Tex. App.—Dallas

12

2005, pet. denied) (party asserting affirmative defense bears burden of pleading and proving its elements). The record, however, reveals no express contract between the parties. Nor did either party establish the existence of such a contract at trial. The Keilmans failed to obtain a jury finding on the matter. Many documents and oral exchanges were at play here, and the Keilmans never established exactly which of them (if any) constituted the contract between the parties.[4] As a result, we cannot determine that "as is" language controlled the sale of the pistol.

Furthermore, while the Keilmans may have disclaimed the pistol's authenticity in written documents, they also allowed affirmative representations of authenticity to be made immediately before the pistol's sale. Under such circumstances, it was proper for the trial court to submit a jury question on whether Featherston purchased the pistol "as is." *See Hyundai Motor Co. v. Rodriguez*, 995 S.W.2d 661, 663 (Tex. 1999) (court should submit to jury all questions raised by evidence). The jury answered that Featherston did not agree to purchase "as is." Unless evidence conclusively established that Featherston purchased the pistol "as is," the court could not disregard the jury's finding. *See* Tex. R. Civ. P. 301 (court may disregard jury finding only if it has no support in the evidence). As mentioned, because of the inconsistent representations regarding authenticity, the evidence did not so establish. The Keilmans' point of error is overruled.

---

[4] Indeed, even at the jury charge conference, which occurred after both sides had presented all their evidence, confusion existed as to which document or documents constituted the contract. One party even suggested, without obvious dissent, that the parties may have had more than one contract.

13

**CONCLUSION**

The record contains substantial evidence supporting the jury's findings that Featherston should recover nothing under the DTPA and nothing from Weller. In addition, the Keilmans did not demonstrate that Featherston's recovery was barred as a matter of law by contractual "as is" language. We therefore affirm the trial court's judgment.

_____

David Puryear, Justice

Before Justices Puryear, Pemberton and Waldrop

Affirmed

Filed:   July 3, 2009