CHARLES A. O.'FERRAL v. W. J. COOLIDGE ET AL.

No. A-2443. Decided March 8, 1950.
Rehearing overruled April 12, 1950.
(228 S. W., 2d Series, 146.)

*Lasseter, Spruielle, Lowry, Potter & Lasater*, and *Chas. F. Potter*, all of Tyler, for petitioner.

It was error for the lower courts to hold that Coolidge discharged the burden of proof that the Arp State Bank did not have knowledge or notice that Rogers owned a 25% interest, not 50%, in the North Grimes lease at the time he gave the Deed of Trust to the Bank covering 50% interest. Jackson v. Waldstein, 27 S. W. 26; Cooke v. Bremond, 27 Texas 457; Hill v. Stampfli, 290 S. W. 522; Goldman v. Blumm, 58 Texas 630.

*Bath & Turner* and *Dean W. Turner,* all of Henderson, for respondent.

The Court of Civil Appeals did not err in affirming the holding of the trial court. Cook v. Smith, 107 Texas 119, 174 S. W. 1094; Littleton v. Giddings, 47 Texas 109; Rogers v. Pettus, 80 Texas 425, 15 S. W. 1093.

MR. JUSTICE BREWSTER delivered the opinion of the Court.

Although this suit was filed on several notes and liens, it has become primarily a controversy between W. J. Coolidge, respondent, and Charles A. O'Ferral, petitioner, as to whether a deed of trust lien held by Coolidge on 1/2 of a 7/8 oil and gas leasehold interest in 106 1/2 acres in Montague County shall prevail over a prior unrecorded assignment of 1/4 of that interest to O'Ferral. A trial court judgment for Coolidge was affirmed by the Court of Civil Appeals. 225 S. W. 2d, 582.

On February 13, 1947, J. O. Rogers executed to Arp State Bank a deed of trust on "50% of the 7/8 leasehold interest" in the 106 1/2 acres (and other realty) to secure an installment note of even date, which note and lien the bank later assigned, without recourse, to Coolidge. O'Ferral asserts that he is the owner of a 1/4 interest in the 7/8 leasehold under an assignment from Rogers made on October 21, 1945, but not filed for record until after February 13, 1947. Coolidge pleaded that the bank made the loan to Rogers without notice of any adverse claim by O'Ferral to Rogers' 1/2 interest in the 7/8 oil and gas leasehold. So the question is whether the bank had notice of the assignment to O'Ferral when it took its deed of trust; and, since Rogers did not testify, the answer must be found largely in the testimony of F. L. Sartin, president of the bank, who handled the loan.

Sartin testified that before the loan was made Rogers said that he owned 1/2 of the 7/8 leasehold interest in the 106 1/2 acres, which representation he, Sartin, passed to the bank's loan committee; that the note and deed of trust were drawn by Rogers and the deed of trust executed and acknowledged by him before a notary in another county and both were tendered by Rogers to consummate the loan; that at the time the loan was made Sartin, "as an officer of the bank, and your loan committee believed and relied on the fact that Mr. Rogers' representation to you that he owned fifty per cent in the north Grimes lease was correct"; that when he made application for this loan Rogers presented a financial statement; that after he,

Sartin, had studied it, "I told him that we would have to get the statement in a different shape" because "it was in such a mess you could not tell anything about it"; that this "first statement did not set out the interest like it should have been and we could not use it"; *that he could not tell from it what interest Rogers had in the lease;* that he and Rogers then revised the statement; that he, Sartin, took "the information that appeared there on that statement" and "wrote up a financial statement" which he turned over to his secretary and had her "type up"; that Rogers then signed this typewritten statement, dated January 30, 1947.

This typed statement listed as among Rogers' assets "1/4 interest—north 106.5 acres Grimes Lease, Montague County one well in process of drilling 26½ acres @ $50.00 $1325.00."

Sartin testified that he was "a little bit uncertain as to the time—the date—when you sat down with Mr. Rogers and you revised that first financial statement and made up this second one" but that it incorporated "substantially the same information as was reflected in the first garbled up statement" except that he put it "in the form you desire your bank to have it"; that he was unable to produce the first statement tendered by Rogers and from which he got his information for the typewritten statement, but that he identified "this financial statement that I hand you" as "the one that you wrote up and turned over to your secretary to type"; that the typed statement was made and signed by Rogers subsequent to January 30, 1947, but that he, Sartin, "could not be sure" whether it was before or after the loan was made; that "I believe" that it was not presented to the bank's loan committee when the Rogers loan was made. In a re-cross examination Sartin's testimony on these points was:

"Q. Let me see if I understand you. I believe you have already testified that all you did was to compile the information in that first financial statement and put it in the form your bank wanted it in order to make the second financial statement? A. I believe my statement was that I got with Mr. Rogers and we checked the old statement and went over it and got it in the form we wanted it.

"Q. That first financial statement, I believe you say, was such you did take it before your loan committee; isn't that right? A. I don't know whether I did or not.

"Q. You testified heretofore it was such you did take it before your loan committee. A. All right.

"Q. You took it before them so they could consider what was in it? A. That is right.

"Q. You would not have any other reason to do that? A. That is right.

"Q. When you got together with Mr. Rogers and reworked it—at whatever time you did that—you did have the benefit of that first statement when you were discussing it with Mr. Rogers? A. Yes sir.

"Q. And you discussed with him the various information you incorporated into this statement, did you not? A. Yes.

"Q. You discussed with him all the information there; that is true? A. That is right.

"Q. Did you have any disagreement with him at that time, or argument with him, because the second financial statement just showed that he owned a one-fourth interest in the north Grimes? A. No sir.

"Q. You had no difference with him at all? A. No sir.

"Q. You were satisfied with the information you got in that second financial statement, were you not? A. Yes; that was his statement; you can take a statement without being satisfied with it.

"Q. You had no disagreement with him about the statement? A. No sir.

"Q. You did not even discuss with him at that time the fact that he just had a one-fourth interest in the north Grimes? A. Not that I recall.

"Q. You did not argue with him about it? A. No sir.

"Q. You must have discussed it with him because you set it down in your handwriting? A. Yes sir.

"Q. And your stenographer copied it off? A. That is right.

"Q. The truth of the matter is that you were not very much interested in the north Grimes? A. That is right.

"Q. You did not pay close attention to it? A. That is right.

"Q. Because your security was really the South Grimes that you made the loan on? A. That is right."

O'Ferral's assignment from Rogers, who was his brother-in-law, recites that it was signed and acknowledged on Oct. 21, 1945. The notary who certified the acknowledgement was Rogers' son-in-law and had no commission as a notary on Oct. 21, 1945. Moreover, Rogers did not acquire his lease on the North Grimes 106½ acres until November 5, 1945. However, O'Ferral testified that the assignment from Rogers was in fact executed on Oct. 21, 1946, at which time the notary did have a commission; and he identified a letter from Rogers dated Oct. 21, 1946, which he said transmitted the assignment.

The trial court decreed that Coolidge's deed of trust lien against 1/2 of the 7/8 leasehold interest in the 106½ acres is superior to the claims of O'Ferral. There being no findings of fact and none requested, his judgment implies that the trial judge found from a preponderance of the evidence that when the Arp State Bank closed the loan with Rogers it had no actual notice of O'Ferral's unrecorded assignment and on information to put it upon an inquiry which would have led to knowledge that he had the assignment from Rogers of a 1/4 interest, provided there was evidence to support such a finding. Bostwick v. Bucklin (Civ. App.), 190 S. W. 2d, 814 (affirmed, 144 Texas, 375, 190 S. W. 2d, 818.).

■ Ordinarily, notice is a question of fact which is foreclosed by the judgment of the trier of the facts; it becomes a question of law only when there is no room for ordinary minds to differ as to the proper conclusion to be drawn from the evidence. Wininger v. Ft. Worth & Denver City Ry. Co., 105 Texas, 56, 143 S. W., 1150.

Because the deed of trust which Rogers himself prepared, executed and tendered to get his loan from the bank covered 1/2 of the 7/8 leasehold interest in the 106½ acres, described as the North Grimes lease, there was a solid basis for Sartin's claim that both he and the loan committee relied on Rogers' representation that he owned that ½ interest. It would seem also to be a sufficient reason why the financial statement tendered by Rogers and which was "in such a mess you could not tell anything about it" and "did not set out the interest like it should have been" and from which Sartin said he could not tell what interest Rogers had, did not excite an inquiry by Sartin or the loan committee which, pursued, would have disclosed the outstanding, unrecorded assignment of 1/4 of the 7/8 lease-hold interest to O'Ferral. In the face of Rogers' positive, written representation that he then owned a ½ interest in the lease, we do not think that the ordinary, reasonable mind is forced to conclude that an unintelligible financial statement informed Sartin and the loan committee that Rogers in fact owned, or warned them that Rogers might own, only a 1/4 interest.

While Sartin did testify that he took the "garbled up" statemen—"that first financial statement"—discussed all its "information" with Rogers and incorporated it in a second statement, all of which he also discussed with Rogers, and then had it typed by his secretary showing that Rogers owned a 1/4 interest in the North Grimes lease, he also testified that he "could not be sure" whether it was before or after the loan was made. We

think, however, that the trial court was justified in concluding that this occurred after the loan was closed because if Sartin had then been in possession of the second statement typed "in the form you desired your bank to have it", there was no reason for him to take to the loan committee for consideration, as he testified he did, "that first financial statement" which "was in such a mess you could not tell anything about it" and from which Sartin could not tell what interest Rogers owned in the lease. That conclusion may also find support in Sartin's testimony that he was not particularly interested in the North Grimes lease anyhow because the bank's "security was really the South Grimes" and in his further testimony that the custom of requiring a financial statement of a borrower is "for the benefit of the bank examiner."

Viewing only the relevant testimony which is favorable to the trial court's finding and disregarding all that is unfavorable, as we must, we cannot say that there is no room for ordinary minds to reach the conclusion that he did. We, therefore, overrule O'Ferral's contention.

■ The other point presents a question which should never arise. By interlocutory order made on motion of the litigants, including O'Ferral, the trial court granted a receivership to take the leases and other properties involved and to operate and maintain them pending the suit, subject to further orders of the court. By agreement of the parties, including O'Ferral, he appointed T. A. Bath, one of the attorneys representing Coolidge, as receiver. Bath offered to serve without compensation but the parties agreed that he should be paid out of moneys collected by him. He took over the properties in June, 1948, and continued as receiver until after final judgment was entered on March 3, 1949, when, under orders of the court, he made private sale of designated properties involved, his client, Coolidge, becoming the purchaser of the leasehold now in dispute. The sale was in all respects regular and there is no claim that any of Bath's official acts were in any way improper. Although O'Ferral consented to Bath's appointment, he did object to the order included in the final judgment authorizing Bath to make the sale.

Bath's appointment clearly was in violation of Art. 2294, R. S., 1925, which reads: "A receiver for property within or partly within this State must, when appointed, be a bona fide citizen and qualified voted of this State, and if so qualified and appointed he shall keep and maintain actual residence in this State during the pendency of such receivership; and if not so

qualified, his appointment shall be void in so far as the property within this State is concerned. *No party, attorney or any person interested in any way in an action for the appointment of a receiver shall be appointed receiver therein."* (Italics ours.)

This statute was first enacted in 1887, and it read: "No party, attorney, or person interested in an action shall be appointed receiver therein, nor shall any person be appointed receiver in any case where the property lies within this State unless he is a bona fide citizen of the State of Texas and qualified to vote." Acts 20th. Leg., Reg. Ses., 1887, Chap. 131, p. 120, Gammel's Laws of Texas, Vol. 9, p. 918. It was amended in 1889 and, except in arrangement, the amending act was substantially in the language of Art. 2294, supra. It provided that the appointment of any non-citizen as receiver "shall be absolutely null and void in so far as the property situated within this State is concerned." Acts 21st Leg., Reg. Ses., 1889, Chap. 59, p. 55, Gammel's Laws of Texas, Vol. 9, p. 1083. But the Act did not declare void the appointment of an interested party or his attorney as receiver; nor has it ever so provided. Whether that circumstance has any determining significance or not, the statute "does not make void, but merely voidable, the appoint as receiver of an interested party." James v. Robert's Telephone & Electric Co. (Com. App.), 206 S. W., 933. And, where a stockholder in an insolvent corporation was appointed receiver and served for more than a year and for more than two months after intervening stockholders had moved for his removal on the ground that he was a party to the suit and interested in the subject matter, he was entitled to compensation because the record disclosed that the business of the estate had received his "sedulous care and attention", despite the fact that seasonable objection had been made to his appointment. Ferguson et al. v. McLean et al. (Civ. App.), 139 S. W. 2d, 227. Nor does "the appointment of persons as receivers who are intersted in the act of appointment of a receiver" render the appointment void, because the court, "with the parties and the subject-matter before it, has the jurisdiction to make an appointment; and the mere fact that it appoints an improper person as receiver cannot, in the nature of things, render the judgment void." San Antonio & A. P. Ry. Co. v. Adams et al. 11 Texas Civ. App. 198, 32 S. W., 733. So we hold that Bath's appointment was, at most, only voidable.

This suit involved oil and gas leasehold interests of several claimants other than O'Ferral and Coolidge in numerous tracts of land in Montague and Edwards counties. O'Ferral claimed

only a 1/4 interest in the North Grimes, above discussed, and a 1/16 interest in the South Grimes. In his final judgment in this case, wherein Bath, receiver, was ordered to make sale of the properties, the trial court found there was no necessity for O'Ferral's interest in the South Grimes to remain longer in receivership and ordered it restored to O'Ferral; therefore it was not sold. Having found that Coolidge's lien on the North Grimes was superior to O'Ferral's claim, the trial court adjudged "that it will be prejudicial to the rights of the superior lien holder, W. J. Coolidge, to order the marshaling of said lien as prayed for by the defendant, Charles A. O'Ferral" and ordered it sold by the receiver along with the other described properties.

■ It appears that Coolidge got judgment in this case for about $59,000 and that the judgment for other plaintiffs amounted to around $11,000. It further appears that after all moneys realized in the receivership had been applied there remained a little more than fifty cents on the dollar of these judgments unsatisfied.

In this connection, O'Ferral says the "only injury which could have resulted (from Bath being receiver) would be the property would have brought a greater price if it had been sold by a disinterested party", since Bath's "duty to his client was to assist him in purchasing the property at the lowest price, whereas his duty as receiver was to sell the property for the highest price." However, Bath testified, without dispute, that he notified all parties by mail of the time and place of sale and put minimum bids on the property and invited the bidders to confer and if anyone wanted to make a higher bid "I would be glad to receive that higher offer"; and that he later asked O'Ferrall's counsel "why he did not come over" to the sale, to which counsel replied that "they were not interested in buying the property or any part of the property at any price and for that reason they did not bid."

Under those circumstances we have concluded that no harm was shown to have resulted to O'Ferral because of Bath serving as receiver and that, therefore, he is in no position to urge that the receiver's sale be set aside.

The judgment of the Court of Civil Appeals is affirmed.

Opinion delivered March 8, 1950.

Rehearing overruled April 12, 1950.