# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs November 18, 2010

## IN RE DESTINY H. A. A. M. M. M., ET AL.[1]

### Appeal from the Juvenile Court for McMinn County
### Nos. 26924-J & 27309-J    James F. Watson, Judge

### No. E2010-01367-COA-R3-PT - Filed January 27, 2011

The State of Tennessee Department of Children's Services ("DCS") filed a petition seeking to terminate the parental rights of Christina M. ("Mother") to her daughters Jazsman (d.o.b. 5/28/08) and Destiny (d.o.b. 11/18/09).[2]  DCS was excused from being required to make reasonable efforts to assist Mother to accomplish the goal of reunification because she has previously had children removed involuntarily from her custody.  Tenn. Code Ann. § 37-1-166(g)(4).  The trial court found and held that clear and convincing evidence existed on the ground of mental incompetence to terminate Mother's parental rights and that termination was in the best interest of the children.  Mother appeals, asserting that DCS should have been required to make reasonable efforts to maintain her daughters in her care.  We affirm.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed; Case Remanded

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which HERSCHEL P. FRANKS, P.J., and CHARLES D. SUSANO, JR., J., joined.

Matthew C. Rogers, Athens, Tennessee, for the appellant, Christina M.

---

[1]This court has a policy of protecting the identity of children in parental termination cases by initializing the last names of the parties.

[2]Extensive history exists between Mother and DCS.  This is the second time that Mother has had her parental rights terminated.  She is the mother of four children:  Gracie, J'Izaia, Jazsman, and Destiny.  Her parental rights to Gracie and J'Izaia were terminated in 2008 based on, among other grounds, her mental incompetence.  *In re: Gracie H. and J'Izaia H.*, No. E2008-02176-COA-R3-PT, 2009 WL 564290, at *24 (Tenn. Ct. App. E.S., Mar. 5, 2009).

Robert E. Cooper, Jr., Attorney General & Reporter, Michael E. Moore, Solicitor General, and Elizabeth C. Driver, Senior Counsel, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

Laurie Hallenberg, Knoxville, Tennessee, Guardian ad Litem.

**OPINION**

## I. BACKGROUND

An investigation concerning Jazsman was opened in June 2008, after DCS received a referral that she was not being supervised by Mother. Amanda Morse, the DCS child protective services case manager assigned to this matter, was initially optimistic after visiting Mother's home. She noted that Mother's husband, Verlin M.[3] ("Father") was employed and their friend, Mark Jarvis (also living in the home) was willing to help supervise Jazsman.[4] After conferring with her supervisor, on June 27, 2008, Ms. Morse initiated a non-custodial permanency plan ("Plan") with Mother addressing the issues of 24/7 supervision. The Plan designated Father and Mr. Jarvis as the individuals responsible for supervising Mother at all times when she was caring for Jazsman. However, Ms. Morse remained "very concerned with [Mother's home at] Lot 23 . . . the floor was bare to the plywood in a couple of spots. There was peeling wallpaper everywhere. The house always smelled. I would stop by and sometimes there would be five dogs[.]"[5] To address these concerns, the Plan also required that Mother accept the services of Family Menders, an in-home support vendor for children and families. Initially, Mother generally complied with this Plan. Subsequently, however, Mother refused to allow Alahendra Rivera, a Family Menders employee, into her home, accusing her of child abuse "because she saw Ms. Rivera have car seats in her van and she assumed there were children in there and she also stated that Ms. Rivera didn't like her dogs[.]"[6] Yet the cleanliness issues Ms. Morse identified with the home at Lot 23 were resolved temporarily when Mother's mobile home caught fire in September 2008, and the family moved to a new trailer at Lot 17 in the same park.

In May 2009, DCS received another referral concerning Mother, again alleging lack of supervision. Upon visiting the home, Ms. Morse observed that Father and Mr. Jarvis were

[3]A registered sex offender.

[4]Ms. Morse testified that Mr. Jarvis passed a routine background check.

[5]Mother was residing in an older mobile home.

[6]Ms. Morse subsequently referred Mother to Hugs, another in-home support vendor.

no longer living at the residence; instead, two teenage boys were living there. Multiple dogs were found inside the home, and there was a distinct smell; otherwise she found the home acceptable from a cleanliness standpoint. Ms. Morse testified that she was concerned about the lack of supervision, but was encouraged by Mother's demeanor.

Ms. Morse testified that she visited the home again five days later, at which time Mother had complied with her requests to reduce the number of dogs in the home and to address an apparent cockroach infestation. Ms. Morse also confirmed that Mother consistently had been taking Jazsman to her medical appointments; however, she could not determine to what extent Mother was keeping her own appointments at Hiwassee Mental Health Center ("HMHC"). Based on Mother's progress, Ms. Morse initiated a second Plan that eliminated the requirement that Mother be supervised while she cared for Jazsman.

According to Ms. Morse, it was around this time that Mother's situation began to deteriorate. A week after the creation of the second Plan, Ms. Morse received a phone call from Mother that she was not living in her mobile home because the power had been cut off. While Mother accused Father of cutting her power lines, the utility company informed Ms. Morse that the electrical service had been disconnected for nonpayment. Ms. Morse testified that she saw Mother again on May 29, 2009, at which time Mother told her that the woman with whom Father was having a relationship had attempted to kidnap Jazsman by crawling through a window at the home. Although Mother claimed to have reported the incident to the police, Ms. Morse could find no record of the alleged incident.

Four days later, on June 2, 2009, Ms. Morse again visited Mother's home, at which time she observed the roach infestation had worsened to the point that the roaches were all over the living room. Ms. Morse stated that Mother continued to make unusual statements that either could not be verified or proved to be untrue, such as that Mr. Jarvis had broken into her house and assaulted her and that Father had been arrested. When Ms. Morse reviewed Mother's HMHC medical records, she noted that Mother also had made several unusual statements to HMHC staff, including claims that she had been assaulted by a man named Will Hicks, that she was going to become a foster parent, and that the dogs in her home were not hers but that she was boarding them for their owners -- even though HMHC staff repeatedly noted that the dogs were always at the home when they visited.

Two weeks later, Ms. Morse received another referral concerning Mother, alleging environmental neglect. She subsequently visited the home on June 18 and again on June 24; both times she observed that Father was again residing with Mother. During the latter visit, Ms. Morse observed that Jazsman was especially dirty. She recommended that Mother assist her in giving Jazsman a bath. Mother became very agitated at her for suggesting that Jazsman was unclean and asked her to leave. Ms. Morse thereafter conferred with her

supervisor and scheduled a meeting with Mother and the DCS staff on July 6, 2009. Ms. Morse recalled her interactions with Mother:

> Every time I talked to her, it was just a little bit stranger. . . . She got a little bit wilder and the house got a little bit dirtier. I mean, the last time [the roaches] were up the walls. . . . And I would talk to her about it and it was like she wouldn't even notice that she had a roach infestation. She was like, oh, we're handling that, there's just a few of them. It's like there's not just a few of them. This is serious. . . . Patrick Wiseman and Dustin Shelton were still living in the home off and on in June and certainly in May they were there. And we ran some background checks on them and they both have pretty extensive juvenile delinquent histories.[7]

At the July 6 meeting, DCS planned to address Mother's destructive behaviors and to implement a new Plan reinstating supervision over Mother. There was no plan to remove Jazsman that day. However, when Mother was informed that supervision would again be required, "all hell broke loose." According to Ms. Morse, Mother "flipped out. [S]he was cursing at me and she started calling people [on her cell phone] saying that she was going to take Jazsman and leave and she wanted to go to Minnesota[8] and she was just calling what appeared to be every number in her phone and she ripped up the plan."[9]

Barbara Meyer, a DCS foster care case manager, corroborated Ms. Morse's testimony, recalling that "I heard all of a sudden [Mother] screaming obscenities . . . I saw her ripping up some papers and cussing out DCS and generally [in an] agitated state . . . ." It was at this point that Ms. Morse and the DCS staff determined that unless Father's family could take custody of Jazsman, it would be necessary to remove her. According to Ms. Morse, no one in Father's family could be reached.[10] When Ms. Morse informed Mother that DCS would be removing Jazsman immediately from her custody, Mother ran out of the office screaming

---

[7]Other individuals staying at the home included "Joseph," a 17-year-old and his pregnant girlfriend, Mr. Hicks, "JR," and Doug Clowers.

[8]Mother apparently had relatives in Minnesota.

[9]Mother testified that she refused to sign the plan because she could not read it. Father stated that Mother exclaimed that "she didn't want to be supervised, ripped the paper up, [and] threw it at them."

[10]Ms. Morse further testified that when a relative placement was attempted, "[w]e called [Father's] family and they were not able to, like we talked to them extensively about it and the elder Mr. M[.] works and his mother is elderly and not able to do it. And whenever we would ask [Mother] about her family, we get different names and different locations and we were just unable to actually locate anyone."

-4-

and threatening to commit suicide. Mother later was taken to the Athens Regional Medical Center ("ARMC") emergency room for an apparent suicide attempt.

Mother eventually was involuntarily admitted to Peninsula, a psychiatric facility. Her initial psychiatric assessment reflects that Mother denied intentionally overdosing, and instead reported that Father had coerced her to take certain medication by threatening to call DCS and inform them that she was not taking her medications as required. The assessment further recorded that Mother "state[d] that her daughter was taken into custody because she had become upset during a meeting with the DCS worker and when she felt she was not being heard, regarding a certain issue, she tore up the contract and left the room." Mother was discharged from Peninsula two days later. Mother told Father at that time that "she didn't take [any pills] and that she was cleared of all her medications and she was found mentally stable." She reported to Ms. Morse that the doctors at Peninsula told her she did not have to be on any medication. The discharge report from Peninsula reflects no such instruction from her attending physicians.

When Jazsman was taken into DCS custody, she was dirty and sticky. Upon opening the diaper bag to retrieve clean clothes, cockroaches came crawling out. Both Ms. Morse and Ms. Meyer examined Jazsman and discovered what appeared to be insect bites in and around the vaginal area. Dr. Snyder, Jazsman's doctor, confirmed that the marks were insect bites.[11] Ms. Morse also recalled finding eight bottles of grape juice in the diaper bag, "some of them smell[ing] like wine they were so old."

On July 9, 2009, DCS filed a petition to have Jazsman adjudicated dependent and neglected and to terminate Mother's parental rights to her.[12] DCS combined the petition for removal with a petition to terminate Mother's parental rights because Ms. Morse had been working with her for a year and had concluded that Mother was unstable. Additionally, by the time Jazsman was removed, the termination of Mother's parental rights to her two oldest children had been upheld by this court on the ground of mental incompetence. Accordingly, DCS requested that it be relieved from making reasonable efforts to reunite Mother with

---

[11]Additionally, a trial exhibit reflects that John M. Fox, DDS, examined Jazsman's gums and found them to be red, swollen, and susceptible to bleeding. He noted that "[t]he erupted teeth on the upper arch appeared to be demineralized, with erosion of enamel. This has exposed the inner layer of the teeth which can contribute to decay and sensitivity. Poor home care was a contributing factor."

[12]Father later voluntarily surrendered his parental rights to Jazsman in November 2009.

Jazsman under Tenn. Code Ann. § 37-1-166(g)(4)(C).[13]

Destiny was removed from Mother's custody at the hospital on the day of her birth, November 18, 2009,[14] and DCS was granted protective custody the following day. After Mother was informed that Destiny would be removed, Mother called 911 and reported that Ms. Morse was trying to kidnap not only Destiny but also her. Mother claimed that she had a letter from the trial court stating that DCS "would never be able to remove her children because [they] had stalked her over the course of the summer . . . ." Ms. Morse testified that after her visit, Mother had been transferred to the ICU for 24-hour supervision for repeatedly calling 911 and being verbally abusive to the staff.

Trial on the termination of Mother's parental rights was held on March 24, 2010. Ms. Meyer testified that she was at that time the DCS foster care case manager for both Jazsman and Destiny following their removal. She recalled communicating with Mother off and on until approximately the end of January 2010. From her observations of Mother during this period, Ms. Meyer, who had worked previously with Mother when DCS took custody of Gracie and J'isaia, concluded that Mother's mental health was generally unstable.

According to Ms. Meyer, Mother continually made statements and behaved in ways that suggested a "distortion of reality." She recalled that when she communicated to Mother that Jazsman's diaper bag had contained a large number of cockroaches and that Jazsman appeared to have cockroach bites in her vaginal region, Mother replied that she was unaware she had roaches, even though the roaches were running up the walls. In August 2009, Mother also told Ms. Meyer that Jazsman would really miss running and playing with her dog. Ms. Meyer found this claim bizarre since Jazsman was under a year old and was not yet walking.

Ms. Meyer also testified that between December 2009 and January 2010, Mother repeatedly told her that she was working for the Brown Law Firm in Athens, Tennessee; Ms. Meyer determined that no such firm existed in Athens. Also, Mother stated that she was working for the East Tennessee Fugitive Team and that a member of that team named Larry had written her a letter evidencing this fact and had placed it on file at the courthouse. Ms. Meyer, however, was never able to locate the alleged letter. Other examples of strange behavior recalled by Ms. Meyer included Mother reporting that she had formally adopted

---

[13]Mother acknowledges that Tenn. Code Ann. § 37-1-166(g)(4) exempts DCS from being required to make "reasonable efforts" when the parent in question has previously had children terminated involuntarily.

[14]Father voluntarily surrendered his parental rights to Destiny in December 2009.

various individuals living in her home; that she was herself a foster parent; and that Father's deceased twin brother -- not Father -- was in fact the man listed on the Tennessee Sex Offender Registry. Even up through the time of the trial, Mother continued to maintain that she would get all four of her children back. Ms. Meyer concluded that returning Jazsman and Destiny to Mother's care would jeopardize the well-being of the children.

Heather Conner, an out-patient therapist at HMHC, testified at trial that she had engaged in therapy with Mother since August 2008, seeing her at least once a month. Ms. Connor observed that over time, Mother's statements to her had become increasingly more bizarre and her "delusions were becoming more far fetched." When Ms. Conner met with Mother a little more than a week after Jazsman had been removed by DCS, Mother's explanation of why Jazsman had been taken from her custody was "unclear" and she indicated that both Father and DCS had acquired custody. In August 2009, Mother expressed that DCS took Jazsman because she had been unable to read a paper they wanted her to read. Later that same month, Mother reported to Ms. Conner that she recently had discovered that Father was not the biological father of Jazsman, that DCS had "found her home satisfactory to have her children there," that she would soon be testifying against Father in a statutory rape case, and that she would be traveling to Minnesota to give birth to her baby. In October 2009, Mother told Ms. Conner that the DCS matter remained unresolved because the presiding judge was somehow related to Father; that she was pregnant with twins but one had died and was still in utero; and that she had a large cancerous tumor that was to be removed in a "14.5 hour surgery" after she had given birth. In January 2010, Mother indicated that she was not concerned about her situation with DCS because she was convinced that both her daughters would be returned to her. In their last session together in February 2010 before the trial, Mother reported to Ms. Conner a story of working with "the feds" to set up her cousin who had murdered his wife. Mother went on to recount that she had been living in a safe house for two weeks and was considering a career as a bounty hunter. Additionally, she claimed that the fugitive task force was going to help her get her children back. According to Ms. Conner, she tried to provide Mother with supportive therapy to bring her back to reality, but Mother rationalized every truth that contradicted what she reported.

Pamela Bragg, Mother's HMHC case manager beginning in January 2010, testified that Mother informed her that the judge was pleased with her progress and that she would be regaining custody soon through the appellate courts in Nashville. After speaking with Mother's DCS caseworker, Ms. Bragg told Mother that she should be prepared for another outcome. In a meeting in March 2010, Ms. Bragg recalled Mother describing her work with the East Tennessee Fugitive Team and that she had become certified as a bounty hunter (although she could not produce her license when asked by Ms. Bragg). Mother also reported that Jazsman and Destiny had been on their way to be reunited with her when they were T-boned by another car; according to Mother, while uninjured, they had been kept in

the hospital for observation. Ms. Bragg observed that she would ask Mother for proof of her claims because she did not want Mother to get her hopes up for events that were not going to happen. However, Mother became agitated with her and claimed that her work with the fugitive team would help her regain custody of her children.

Both Dawit Zemichael, Mother's psychiatrist at HMHC, and Tom Biller, a clinical psychologist who performed two separate psychological and parenting assessments on Mother in 2006 and 2009, testified by deposition as to Mother's mental incompetence. Dr. Zemichael treated Mother for approximately four to five years, during which time she had missed numerous appointments. When Dr. Zemichael first assessed Mother, he diagnosed her with bipolar disorder with psychotic features and schizoaffective disorder, bipolar type.[15] According to Dr. Zemichael, Mother also had some traits of borderline personality disorder. A diagnosis of delusional disorder was added in 2006, based on Mother's habit of entertaining "grandiose" perceptions of herself that were not reality based. When Mother was last seen by Dr. Zemichael prior to trial in February 2010, he concluded that she was still suffering from a bipolar disorder and was actively delusional. Dr. Zemichael noted that "the personality disorder is one that's there . . . [u]nless she goes through [ ] some therapies, it's hard to get rid of." He prescribed numerous medications to control Mother's symptoms, although he believed, based on her lack of progress over time, that she was generally non-compliant with her medication regimen. From 2008 through 2010, assessments revealed that Mother had severe and persistent mental illness and had not made any progress in overcoming her condition. In Dr. Zemichael's opinion, Mother would not be capable of parenting a child within the foreseeable future.

On both occasions that Dr. Biller assessed Mother, he diagnosed her with a schizophrenia paranoid type disorder and a borderline personality disorder. His overall conclusion after comparing the 2006 and 2009 assessments was that in 2009, Mother exhibited "guarded" and "paranoid" behavior in responding to the testing, whereas in 2006 she was more open and honest about her personal history with mental and emotional problems. Accordingly to Dr. Biller, in 2006 Mother acknowledged having depression and difficulty sleeping; she described past suicide attempts and a current eating disorder; she reported an in-patient hospitalization after having a nervous breakdown; she admitted using marijuana and crack in the past; she recalled having had mental health counseling since the age of 12; and stated that both her step- and biological father abused her as a child. However, in 2009, Mother reported having little or no depression; she denied being

---

[15]Father testified that Mother told him "she had split personalities, schizophrenic, bipolar"; that she had named the different personalities; and that "at one time she had told me that she could kill me in my sleep and get away with it." Father noted that "one minute she would be nice and the next minute she would just -- her mood would change and she would start yelling and screaming and throwing things."

hospitalized at any psychiatric facility other than Peninsula, which she claimed was not for a suicide attempt; she denied having any suicidal tendencies; she denied ever using illicit drugs; she admitted getting one DUI, although she claimed it was a result of her taking anti-seizure medication; she essentially denied having any mental health history; and she denied ever being abused by her biological father. Accordingly, Dr. Biller concluded that in 2009, Mother appeared to be making a deliberate attempt to minimize her problems and the difficulties in her life. He specifically observed as follows:

A. She did not give an accurate picture of herself. She painted a picture of herself as she wanted to be, not how she was.

Q. Okay. You said that very euphemistically. You said she's painting a picture. Is she lying?

A. Either she is deliberately hiding things or she is so pathologically disturbed that she is unable to tell the truth about herself and what she wants to be the truth.

Q. And do you know which it is? Is she so pathologically disturbed that she doesn't know the truth?

A. Probably not. I mean, from what I see, it's more like she is characterological -- in other words, by that I mean she is making a very strong attempt to present herself favorably because she would like very much to get her children.

Dr. Biller further testified that Mother's test scores created the impression of either "a normal individual who is very self-controlled, rigid and lacking in insight or a person who uses excessive repression [or] denial or a naive, unsophisticated individual trying to create a very favorable impression of herself . . . and I think it's the latter . . . ." He observed that the diagnosis of borderline personality disorder was appropriate and the prognosis for Mother remains poor. He also noted that Mother's chronic problems of a "characterological" nature have not changed and are at the core of borderline personality disorder:

[T]he borderline personality is an individual who has a history of distorted relationships, a history of having problems with depression and/or at time mania, a person that may have delusions, paranoia, a history of substance abuse, a history of a suicide attempt or two and just a series of relationships that are very dysfunctional. . . . They have a tendency to overidealize. Either you are the best person in the world or if you let them down, you immediately

become the worst. . . . It makes it difficult to parent because the person has so many emotional problems themselves that their own needs oftentimes get in the way of the needs of the child. [They tend to care for themselves] [t]o the exclusion of everyone.

Borderline personality disorder, according to Dr. Biller, requires more than just medication -- it requires "personality reconstructive therapy," a specialized treatment that involves extensive counseling and therapy for one-and-a-half to three years to be effective.[16] Dr. Biller noted that such therapy is extremely expensive, and, even if available, the chance of it resulting in significant improvement in Mother's mental health was extremely unlikely given her past denial and resistance to treatment.[17] He concluded that Mother was likely to remain severely mentally impaired without the proper treatment. Dr. Biller recommended against any children being placed in Mother's custody, as Mother was potentially a danger to herself and others.

During Mother's testimony, she denied knowing the full extent of Father's crimes as a sex offender when she married him or being told by anyone from DCS that marrying a sex offender would be a barrier to reunification with her children; she denied there ever being any dog feces in her home, despite the testimony of Father's father that he had to "pick [his] way through to [Mother's] bedroom because of the dog manure in the floor"; she denied ripping up the Plan at the July 6 meeting, threatening to leave the state with Jazsman, or ever threatening or attempting suicide that day; she claimed she could not recall being in Moccasin Bend (a psychiatric facility in Chattanooga) in 2002; she denied working for or ever claiming to work for the Brown Law Firm; she denied telling Ms. Bragg that she was a certified bounty hunter; and she claimed that she complied with all Plan requirements, and that she maintained a clean home for Jazsman. As to her behavior on July 6, she recalled "acting really strange" after taking some medication given to her by Father at the meeting. Mother testified that "I didn't know if he gave me too much or not . . . I don't act like that. I wouldn't harm myself being pregnant. And no, I did not say I was going to kill myself or harm myself." Father testified at trial that he never actually heard Mother threaten suicide, although he received a phone call from Mr. Jarvis around 30 minutes after the meeting had ended, who informed him that Mother "had just took a whole handful of pills." Father

_____

[16]Personality reconstructive therapy was not recommended until the 2009 evaluation, after DCS had already been relieved of making reasonable efforts.

[17]Dr. Biller noted that "of the two, probably the borderline personality disorder is more dysfunctional than the schizophrenia because the schizophrenia is easier to control chemically than the borderline personality because the borderline personality is the character, the very nature of the individual, whereas the schizophrenia is the neurotransmitter system that's out of [order] and if you can regulate the neurotransmitter, then you can help the person to deal with the schizophrenia."

-10-

recalled arriving at Mother's home and locating her locked in the bedroom. He kicked in the bedroom door to find Mother standing next to what he described as her "pill bag . . . a green bag that she keeps all her medication in." Father stated that when he inquired of Mother whether she had taken any pills, she indicated to him that she had taken "a handful or two." An ambulance was then called. Mother's medical records from ARMC indicate that she reported to staff there that she had taken numerous pills and was suicidal as a result of Jazsman's removal.

The evidence of record reveals that Jazsman and Destiny have done well in their foster home. The girls have been healthy with the exception of minor allergy problems; Jazsman recently had tubes placed in her ears. The testimony revealed that Jazsman is shy until she gets to know a person, after which time she talks a great deal. Jazsman and Destiny reportedly were bonded with their foster parents and the foster parents' extended family. The foster parents desire to adopt both girls.

At the conclusion of the trial testimony, the trial court observed as follows:

[T]he Court believes, much as some of the witnesses here today have said, that [Mother] is well intentioned, loves her children and I don't think there's . . . an ill-intentioned bone in her body as to her children, but that's not what this case is all about.

* * *

Dr. Zemichael said there's been no improvement since 2008 in her ability to safely parent a child and, again, that's not likely to improve unless there's -- unless she's compliant with medication.

* * *

Basically, . . . Dr. Biller said that the only way that [Mother] can safely and effectively parent is if she has someone to live with her 24/7 and take care of the children and that he believes her conditions have -- or condition has deteriorated since 2008 and that she's chronically ill and very strong likelihood of remaining that way.

. . . But the proof is clear and convincing that . . . the Department still tried to work with [Mother], that they gave her the opportunity to keep Jazsman without supervision and frankly, it just -- the conditions, circumstances,

environment deteriorated after that resulting in the meeting on July 6th, 2009, in their office where the Department was still wanting to work with [Mother] so that she could keep and parent Jazsman with another plan with supervision and testimony is clear at that point that [Mother] would have none of it . . . .

Because of the deterioration in her mental condition and because of the environment with the dirt and roaches and that she simply was . . . not going to go along with the supervised plan and that's when the Department felt like they had to step in and, I think rightfully so, take custody of Jazsman.

And the proof is and the Court finds that, in fact, [Mother] either did or made a statement to someone that she had taken drugs and I think she even -- the record indicates that she even  said that to the EMS people that she took a handful or two of pills and she was, in fact, hospitalized for attempted suicide on that very day, which certainly affirms the decision by Ms. Morse on that day that things had deteriorated to the point that Jazsman needed to come into custody.

The fact that it's clear from the personal observations, from the testimony and proof in this case that Dr. Biller got it 100 percent right when he said there would need to be 24/7 supervision, but that's not what this case is about, as to whether or not [Mother] can do that.  With 24/7 supervision with the right -- in the right home and with the right supervision, she probably would and still be mother to these children.  The problem is there is no guarantee of anyone who could or would . . . provide that kind of supervision and, in fact, the proof that I've heard today is that [Mother] has chosen the folks to live with her over the course of these last two years are the very kind of people that you could not trust to supervise the raising of two young children.

. . . [A]ll the other proof is that her mental condition is presently so impaired and so likely to remain so that it is unlikely that she would be able to resume the care and responsibility for these children in the near future without 24/7 supervision and that supervision cannot be guaranteed by her or by any other person.

So the Court finds that the State, the Department has proven with clear and convincing evidence . . . the requirements of 36-1-113 . . . .

The second prong of the inquiry today is whether termination is in the best interest of these children.  There are certain factors that the Court must

consider . . . . [T]he first one is whether the parent or guardian had made such an adjustment of circumstance, conduct or conditions to make it safe and in the children's best interest to be [with] the parent or guardian. The Court has already discussed what her condition is and the finding or the opinion of Dr. Biller and that not only has there not been an adjustment of circumstance to make it safe, that it is unlikely in the near future without this intensive kind of therapy that nobody can tell how it can be even accessed and even -- and certainly not in the short term. Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by DCS . . . . They're not required to make reasonable efforts in this case, but the Court finds that they have made -- gone over and above in trying to make reasonable efforts to let [Mother] keep custody of Jazsman . . . they were doing all they reasonably could do and it didn't work.

* * *

I do think that the testimony about these children living in a home with a bunch of dogs and dog feces and urine on the floor and smelling and roach infestation and the testimony that the . . . little girl when she was taken into custody on her genitalia had roach or flea or both bites, certainly that is neglect of Jazsman and that would -- again, that's a symptom of the mental condition, but still it's there and that weighs in favor of termination.

. . . I think the overriding [factor] here is paragraph eight, which says whether the parent or guardian's mental or emotional status would be detrimental to the child or . . . prevent[s] the parent or guardian from effectively providing safe and stable care and supervision for the child. That is the one -- that is, as a matter of fact, the grounds that has been alleged and already ruled proven and that strongly, strongly favors termination.

* * *

If I thought for a moment that [Mother] could within a reasonable period of time address her mental health problems to the extent that she would be able to be a parent to her children, I would want her to have that opportunity. . . . [A]ll the testimony, professional and nonprofessional testimony today gives this Court little or no hope that . . . [can] . . . be done.

Subsequently, on May 27, 2010, the trial court terminated Mother's parental rights to

Jazsman and Destiny due to Mother's mental incompetence. The trial court held as follows:

> [T]he Court finds that clear and convincing evidence has been presented that [Mother's] mental condition is presently so impaired and so likely to remain so that it is unlikely that she would be able to resume the care and responsibility for these children in the near future without 24/7 supervision and that supervision cannot be guaranteed by her or by any other person. The requirements for termination of parental rights pursuant to T.C.A. 36-1-113(g)(8) have been met by the Petitioner.

The trial court further determined that termination of Mother's parental rights was in the best interest of both children. The trial court considered the nine factors set out in Tenn. Code Ann. § 36-1-113(i) and observed as follows:

> As Dr. Biller noted, [Mother] has not made any progress in the past 2 years. Her mental health condition is chronically impaired and the Court finds that she has not made any adjustment of circumstance, conduct or conditions so as to make it safe and in the children's best interest to be in her home.

> While DCS was not required to make reasonable efforts in this case, the Court finds that they have made more than reasonable efforts to let [Mother] keep custody of Jazsman, but those efforts did not work.

> The Court further finds there was proof that Jazsman was living in a home with a bunch of dogs, dog feces and urine on the floor and roach infestation. Jazsman had roach and/or flea bites on her genitalia when she came into custody. That is neglect, as defined by statute, and weighs in favor of termination.

> While there was no proof that there was criminal activity in the home, there was proof that a lot of criminals lived in the home while the minor child, Jazsman, was present and that element of factor 7 weighs in favor of termination.

> Factor 8, "whether the mother's mental and emotional status would be detrimental to the child and prevent her from effectively providing safe and stable care and supervision . . ." is the overriding factor in this case. Based on the mental health professionals' diagnoses and prognoses, it is clear that [Mother's] mental health status has been, and continues to be, the biggest barrier to reunification. This factor weighs in favor of termination.

Weighing all the best interest factors set out in T.C.A. 36-1-113(i), the recommendations favoring termination by the Guardian ad-Litem, and the statutory provisions at the very beginning of Title 36, -- T.C.A. 36-1-1-1(d) -- which states,

> "In all cases when the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and best interest of the child, which interests are her[e]by recognized as constitutionally protected and, to that end, this part shall be liberally construed,"

the Court finds that the Department has proven with clear and convincing evidence that it is in the best interest of these children that [Mother's] rights be terminated and that the custody, control and full guardianship of Jazsman and Destiny M[.] should be awarded to the State of Tennessee, Department of Children's Services.

Mother filed a timely notice of appeal.

## II. ISSUES

The State presents the following issues for review, which we restate:

1. Whether the trial court properly found clear and convincing evidence that Mother was mentally incompetent to parent her children and was likely to remain so for the near future.

2. Whether the trial court properly determined that termination of Mother's parental rights was in the best interest of the children.

3. Whether Mother waived her argument that Tenn. Code Ann. § 37-1-166(g)(4) is unconstitutional by failing to raise the issue at trial. Whether, in any event, the statute is constitutional.

Mother's brief addresses whether DCS should have been required to make reasonable efforts to maintain the children in her care despite the exemption found at Tenn. Code Ann. § 37-1-166(g)(4).

## III. STANDARD OF REVIEW

In the recent opinion of *In re Bernard T.*, the Tennessee Supreme Court provided the following guidance:

Proceedings under Tenn. Code Ann. § 36-1-113 are tried to the court without a jury. Accordingly, appellate courts review the trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). *In re Angela E.*, 303 S.W.3d 240, 246 (Tenn. 2010). Thus, reviewing courts will review the trial court's findings of fact de novo on the record and will accredit these findings unless the evidence preponderates otherwise. *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007).

In light of the constitutional dimension of the rights at stake in a termination proceeding under Tenn. Code Ann. § 36-1-113, the persons seeking to terminate these rights must prove all the elements of their case by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d at 808-09; *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). The purpose of this heightened burden of proof is to minimize the possibility of erroneous decisions that result in an unwarranted termination of or interference with these rights. *In re Tiffany B.*, 228 S.W.3d 148, 155 (Tenn. Ct. App. 2007); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005). Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005), and eliminates any serious or substantial doubt about the correctness of these factual findings. *In re Valentine*, 79 S.W.3d at 546; *State, Dep't of Children's Servs. v. Mims (In re N.B.)*, 285 S.W.3d 435, 447 (Tenn. Ct. App. 2008).

A reviewing court must review the trial court's findings of fact de novo with a presumption of correctness under Tenn. R. App. P. 13(d). *See In re Adoption of A.M.H.*, 215 S.W.3d at 809. In light of the heightened burden of proof in proceedings under Tenn. Code Ann. § § 36-1-113, the reviewing court must then make its own determination regarding whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear and convincing evidence that supports all the elements of the termination claim. *State, Dep't of Children's Servs. v. Mims*, 285 S.W.3d at 447-48; *In re Giorgianna H.*, 205 S.W.3d 508, 516 (Tenn. Ct. App. 2006); *In re S.M.*, 149 S.W.3d 632, 640 n. 13 (Tenn. Ct. App. 2004).

> Appellate courts conduct a de novo review of the trial court's decisions regarding questions of law in termination proceedings. However, these decisions, unlike the trial court's findings of fact, are not presumed to be correct. *In re Angela E.*, 303 S.W.3d at 246; *In re Adoption of A.M.H.*, 215 S.W.3d at 809.

*In re Bernard T.*, 319 S.W.3d 586, 596-97 (Tenn. 2010).

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *O'Daniel v. Messier*, 905 S.W.2d 182, 186 (Tenn. Ct. App. 1995) (rev'd on other grounds, *In re Swanson*, 2 S.W.3d 180 (Tenn. 1999)); *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988). This right "is among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re M.J.B.*, 140 S.W.3d 643, 652-53 (Tenn. Ct. App. 2004). "Termination of a person's rights as a parent is a grave and final decision, irrevocably altering the lives of the parent and child involved and 'severing forever all legal rights and obligations' of the parent." *Means v. Ashby*, 130 S.W.3d 48, 54 (Tenn. Ct. App. 2003) (quoting Tenn. Code Ann. § 36-1-113(l)(1)). "Few consequences of judicial action are so grave as the severance of natural family ties." *M.L.B. v. S.L.J.*, 519 U.S. 102, 119, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996) (quoting *Santosky v. Kramer*, 455 U.S. 745, 787, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982)).

While parental rights are superior to the claims of other persons and the government, they are not absolute, and they may be terminated upon appropriate statutory grounds. *See Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002). Due process requires clear and convincing evidence of the existence of the grounds for termination of the parent-child relationship. *In re Drinnon*, 776 S.W.2d at 97. Tenn. Code Ann. § 36-1-113 is a statute governing termination of parental rights in this state. A parent's rights may be terminated only upon "(1) [a] finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and (2) [t]hat termination of the parent's or guardian's rights is in the best interests of the child." Tenn. Code Ann. § 36-1-113(c); *In re F.R.R., III*, 193 S.W.3d at 530. Both of these elements must be established by clear and convincing evidence. *See* Tenn. Code Ann. § 36-1-113(c)(1); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). The existence of at least one statutory basis for termination of parental rights will support the trial court's decision to terminate those rights. *In re C.W.W.*, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000) (abrogated on other grounds, *In re Aubrey S.*, 182 S.W.3d 838 (Tenn. Ct. App. 2005)).

The heightened burden of proof in parental termination cases minimizes the risk of erroneous decisions. *In re C.W.W.*, 37 S.W.3d at 474; *In re M.W.A., Jr.*, 980 S.W.2d 620,

622 (Tenn. Ct. App. 1998). Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable. *State v. Demarr*, No. M2002-02603-COA-R3-JV, 2003 WL 21946726, at *9 (Tenn. Ct. App. M.S., Aug. 13, 2003), and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence. *In re Valentine*, 79 S.W.3d at 546; *In re S.M.*, 149 S.W.3d 632, 639 (Tenn. Ct. App. 2004); *In re J.J.C.*, 148 S.W.3d 919, 925 (Tenn. Ct. App. 2004). It produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established. *In re A.D.A.*, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002); *Ray v. Ray*, 83 S.W.3d 726, 733 (Tenn. Ct. App. 2001); *In re C.W.W.*, 37 S.W.3d at 474.

## IV. DISCUSSION

### A.

Tennessee law provides that parental rights may be terminated where:

> The parent or guardian of the child is incompetent to adequately provide for the further care and supervision of the child because the parent's or guardian's mental condition is presently so impaired and is so likely to remain so that it is unlikely that the parent or guardian will be able to assume or resume the care of and responsibility for the child in the near future[.]

Tenn. Code Ann. § 36-1-113(g)(8)(B)(i) (2010). Under this statutory ground, the party seeking termination does not need to prove willfulness. Tenn. Code Ann. § 36-1-113(g)(8)(C).

Under the facts of this case, there was abundant evidence of Mother's mental incompetence. She was diagnosed with bipolar disorder with psychotic features, schizoaffective disorder, delusional disorder, and borderline personality disorder. She had at least three in-patient psychiatric hospitalizations, and had been treated for years with counseling and medication. However, according to both Dr. Zemichael and Dr. Biller, Mother had not gotten any better. Accordingly, clear and convincing evidence showed that Mother was mentally incompetent to parent her children and was likely to remain incompetent for the foreseeable future. Thus, the trial court properly terminated her parental rights on this basis.

### B.

-18-

Having concluded that there was clear and convincing evidence supporting the statutory ground relied upon to terminate Mother's parental rights, we must consider whether clear and convincing evidence also supports the trial court's conclusion that it was in the best interest of the children to terminate Mother's parental rights. Tenn. Code Ann. § 36-1-113(c)(2). We are guided by the non-exclusive list of factors provided in Tenn. Code Ann. § 36-1-113:

> (i) In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:
>
> > (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
> >
> > (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
> >
> > (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
> >
> > (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
> >
> > (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
> >
> > (6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
> >
> > (7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian

-19-

consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i) (2010). As this court has noted, "this list [of factors] is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's parental rights is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). The General Assembly has also stated that "when the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child, which interests are hereby recognized as constitutionally protected and, to that end, this part shall be liberally construed." Tenn. Code Ann. § 36-1-101(d). *See White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004) (holding that when considering a child's best interest, the court must take the child's perspective, rather than the parent's).

In this case, a number of the best interest factors weighed against Mother. Mother failed to effect a lasting adjustment after years of services by various social services agencies. Her mental condition prevented her from providing safe and stable care for her children. Tenn. Code Ann. § 36-1-113(i)(8). She allowed numerous individuals who presented a threat to her children to reside with her, her house was overrun with cockroaches, at times her utilities were shut off, and she remained delusional and mentally incompetent. Tenn. Code Ann. § 36-1-113(i)(1) and (2). Neither Jazsman nor Destiny have had a meaningful relationship with Mother -- Jazsman was removed when she was 14-months-old and Destiny never lived with Mother. Accordingly, the children have not known Mother as their parent. Tenn. Code Ann. § 36-1-113(i)(4). As noted in the petition, Mother's mental or emotional state would be detrimental to the children and would prevent her from effectively parenting. Meanwhile, Jazsman and Destiny were doing well in their foster home. Thus, there was overwhelming evidence to support the trial court's determination that termination of Mother's parental rights was in Jazsman's and Destiny's best interest.

C.

Under ordinary circumstances, the law governing termination of parental rights proceedings imposes upon DCS the responsibility to make reasonable efforts to reunify children and their parents after DCS removes the children from the parents' home. *In re Tiffany B.*, 228 S.W.2d 148, 157-58 (Tenn. Ct. App. 2007).

Our legislature, however, has relieved DCS of its duty to provide reasonable efforts to assist parents from whose homes it has removed their children under certain statutorily defined circumstances. Tenn. Code Ann. § 37-1-166 governs DCS's obligation to make reasonable efforts to reunite a parent with his or her child. That statute includes certain exceptions, the ones pertinent to this case are as follows:

\* \* \*

(4) Reasonable efforts of the type described in subdivision (g)(2) shall not be required to be made with respect to a parent of a child if a court of competent jurisdiction has determined that:

\* \* \*

(C) The parental rights of the parent to a sibling or half-sibling have been terminated involuntarily.

Tenn. Code Ann. § 37-1-166(g) (2010). In this case, DCS requested in its initial petitions regarding Jazsman and Destiny that the trial court recognize that Mother's parental rights to her two older children had been involuntarily terminated and therefore relieve DCS from making reasonable efforts to reunite Mother with Jazsman and Destiny. The trial court granted this request.

For the first time in this appeal, Mother asserts that a previous termination of her parental rights is an unconstitutional basis on which to relieve DCS of its reasonable efforts obligation. DCS responds that it is well-established that issues not raised at trial may not be raised for the first time on appeal. *See, e.g., Simpson v. Frontier Community Credit Union*, 810 S.W.2d 147, 153 (Tenn. 1991); *Lawrence v. Stanford*, 655 S.W.2d 927, 929 (Tenn. 1983). We agree with the position of DCS. Because Mother failed to raise this issue below, she has waived it and cannot raise it here for the first time.

Even considering Mother's argument, it is still without merit. Mother argues that subsection (C) of Tenn. Code Ann. § 37-1-113(g)(4) -- a previous involuntary termination -- should only be a basis for relieving DCS of reasonable efforts when a parent has also

subjected a child to aggravated circumstances or committed a crime against a child. Mother's contention ignores the plain language of the statute. Further, a parent is provided due process protection by the requirement that DCS seek a court determination that one of the circumstances in Tenn. Code Ann. § 37-1-166(g)(4) exists -- if the trial court determines that relieving DCS of reasonable efforts is unfair, it can refuse to grant such a request. *In re B.L.C.*, 2007 WL 4322068, at *9-10 (Tenn. Ct. App. Dec. 6, 2007). In this case however, the trial court relieved DCS of making reasonable efforts.

Under the facts of this case, Mother has failed to specify any reasonable efforts which would have made a difference in this case. While she argues that DCS should have provided reconstructive psychotherapy, Dr. Zemichael testified that HMHC did not provide such therapy and Dr. Biller testified that such therapy was extremely expensive, required significant commitment on the part of the patient, and would take one-and-a-half to three years worth of therapy to be effective. However, in the five years that other mental health counseling had been offered to Mother, she missed numerous appointments and had failed to make any significant progress toward improving her mental health. Thus, it is speculative at best that any further reasonable efforts would have made any difference in Mother's ability to overcome her mental incompetence and parent her children.

In light of Mother's marriage since the removal of the older children, DCS made significant efforts to prevent the removal of Jazsman. However, Mother failed to comply. Accordingly, the trial court appropriately relieved DCS of making reasonable efforts. Mother's argument is without merit.

## V. CONCLUSION

The judgment of the trial court is affirmed, and this cause is remanded for collection of the costs below. The costs on appeal are assessed against the appellant, Christina M.

_____
JOHN W. McCLARTY, JUDGE